GEORGE W. THEISEN v. J. T. ROBISON, COMMISSIONER OF GEN-
ERAL LAND OFFICE, ET AL.

No. 4635.   Decided June 25, 1928.
(8 S. W., 2nd Series, 646.)

490

*Ward & Ward,* for relator.

The permit law is a constitutional method of disposition of the oil and gas estate in university lands. Constitution, Art. 7, section 12; Act of June 3, 1837; Cowan v. Hardeman, 26 Texas, 217; Cox v. Robison, 105 Texas, 426; Acts of 1889, p. 116; Acts of 1895, p. 197; Act of April 9, 1913, Laws, 33d Leg. ch. 173; Motl v. Boyd, 286 S. W., 458; Bernavides v. Hunt, 79 Texas, 383; Hager v. Stakes, 294 S. W., 835; Stephens County v. Mid-Kansas O. & G. Co., 254 S. W., 458; Humphreys-Mexia Co. v. Gammon, 254 S. W., 299; Mid-Texas Petr. Co. v. Colcord, 79 Texas, 390; Houston Oil Co. v. McGrew, 107 Texas, 220; Sawyer v. Robison, 268 S. W., 153; State v. Hatcher, 281 S. W., 193; Texas Co. v. Davis, 113 Texas, 321; United States v. Castillero, 2 Black, 220; 40 C. J., 993; Leap v. Leakey, 67 Pa. Super., 337; Cowan v. Christies, L. R., 2 H. L., 273; Miller v. Vandergrift, 3 Ohio Civ. Ct., 730; State v. Dayton Lumb. Co., 155 S. W., 1178; Dahl v. Raunheim, 132 U. S., 260; Potter County v. Slaughter Cattle Co., 254 S. W., 775.

The leasing act of 1925 is void because it makes no provision for a sale of oil and gas, but attempts to confer on the so-called buyer an option or license for a period of five years without any obligation for development, and therefore does not comply with Article 7, Section 12 of the Constitution. Texas Co. v. Davis, 254 S. W., 304; Texas & Pac. C. & O. Co. v. Patton, 238 S. W., 202; Wall v. Texlouana P. & R. Co., 241 S. W., 521. If the law should require development for oil and gas, an estate would pass as held in the group of cases decided by the Supreme Court, among which are Stephens Co. v. Mid-Kansas O. & G. Co., 254 S. W., 290; Texas Co. v. Davis, 254 S. W., 304; Humphreys-Mexia Co. v. Gammon, 254 S. W., 296; Thomason v. Ham, 254 S. W., 317; Munsey v. Marnet Oil & Gas Co., 254 S. W., 311. But the provisions of the Act clearly show that no interest in the land was intended to pass, and it does not provide for or require mineral development, said in Thomason v. Ham, 254 S. W., 317, to be the "essential purposes and objects of the grant." Under a similar constitutional provision authorizing sale by Counties of their school lands, it has been held that they cannot grant an option. Midland County v. Slaughter, 130 S. W., 613, in which writ of error was refused, and Potter County v. C. C. Slaughter Cattle Co., 254 S. W., 775. Since the only object of an oil lease is the production of oil (Texas Co. v. Davis, 254 S. W., 304) an instrument that does not in any way require development for oil cannot be an "oil lease." The power to lease the lands for grazing purposes as provided by the Legislature and as referred to in the case of Smisson v. State, 71 Texas, 231–3, is not in point in this case, as said in Hatcher v. State, 281 S. W., 192.

The leasing act is void because it fails to provide the regulations, times and terms upon which sales of leases shall be made. The Constitution, Article 7, Section 12, expressly provides for the sale of University lands "at such times, under such regulations and on such terms as may be provided by law."

The Act contravenes the Constitution in that it delegates to the Land Commissioner the power and authority to determine the time when leases shall be sold and in doing so in effect clothes him with the power to say whether there shall be any sales or not.

That the land should be sold leaves the time when this shall be done, to the discretion of the Legislature (Swenson v. Taylor, 80 Texas, 594), but when the Legislature has exercised the discretion vested in it by the plain letter of the Constitution and has determined

that the time has arrived to sell such lands, it is mandatory that it shall be sold *"under such regulations, at such times and on such terms as may be prescribed by law."* This does not mean that the law may prescribe the terms and omit the regulations and the times. If it may leave the one or two to the discretion of someone it could leave all three to such discretion. There are powers that the Legislature must exercise. Having failed in either particular, the Act would not stand. Chancey v. State, 84 Texas, 529; State v. St. Louis S. W. Ry. Co., 165 S. W., 496; Lewis Sutherland Statutory Construction, sec. 86, p. 141. The authorities hold that where it is required by the Constitution that something shall be done according to a means provided by law it is absolutely essential that this means be provided by law for the accomplishment of the end. "A casus omissus can in no case be supplied by a court of law, for that would be to make laws." Estes v. Terrell, 99 Texas, 622, 92 S. W., 407. *A fortiori* it should not be supplied by a merely administrative officer, the Land Commissioner. Evans v. Terrell, 101 Texas, 167, 105 S. W., 490; Turner v. Cross, 83 Texas, 223, 18 S. W., 578; Rowe v. Dyess, 213 S. W., 233; 11 Corpus Juris, 31; Trimble v. People, 19 Colo., 187, 34 Pac., 981; Lewis Sutherland Statutory Construction, 608, 609; Logan v. Stephens County, 83 S. W., 367. Because of its attempt to delegate this discretion as to when land shall be sold or whether it shall be sold at all and because of its failure to fix the amount of land to be sold and prescribe the regulations of sale, the act is void.

The leasing act is void in failing to provide what areas of land may be sold.

The act does not fix or determine the specific area to be sold by the Land Commissioner. The Land Commissioner is turned loose under his regulations and fixing the times and terms, to determine what amount of land he will sell or advertise for sale in one tract.

The leasing act is void because its caption has three subjects. Reference to the Act clearly shows that there are three subject matters in the caption. The first relating to the sales of leases, the second to the extension of permits already issued, the third to issuance of leases on permits already issued without the payment of ten cents per acre then required by law for the continuation of permits and the two dollars per acre required by the permit law before issuance of a lease pursuant to production under a permit. This violates Article 3, Section 35, of the Constitution.

The Sales of Leases Act if Valid Does Not Repeal the Permit Law.

Presuming that Chapter 71, page 225 of the Acts of the 39th Legislature, passed March 10, 1925, known as the University Oil Leasing Law standing alone as an independent act of the Legislature would have had the effect by its terms of repealing the Act of 1917 called the Permit Law, the Permit Law was then re-enacted by the same Legislature on March 18, 1925, when it adopted the Revised Statutes of 1925, Articles 5338 to 5352, and as it appears in the Revised Statutes is therefore the latest act of the Legislature on the subject. The Revised Statutes expressly provide that they are to be construed as an Act of the Legislature (Final Title, Section 22). By such re-enactment the two laws were intended to be given effect and be operative, and each furnish a separate and distinct method or manner by which oil and gas in place on University lands could be acquired and are two separate methods by which such minerals might be disposed of.

The two methods of procedure are not inconsistent, and if the Legislature had put them in the same Act, no court would have questioned either method. Here we have them both enacted at the same session and the rule is in such cases to construe them together, as if contained in one act. As held in McGrady v. Terrell, 98 Texas, 427, 84 S. W., 641, where two laws passed at the same session of the Legislature, they should be construed as if contained in One Act, and should be so construed that both may stand. Neill v. Keese, 5 Texas, 32; Napier v. Hodges, 31 Texas, 295.

The rule of construction is that repeal by implication is not favored and it is only held that they do repeal where the Acts cannot be harmonized. There must be such a manifest and total repugnance that the two enactments cannot stand. Lewis Sutherland Stat. Con., Sec. 247, p. 465, 467; Sayles v. Robison, 103 Texas, 430, 129 S. W., 347; Cole v. State, 106 Texas, 472, 170 S. W., 1036; Southern Pacific Co. v. Sorey, 104 Texas, 476, 140 S. W., 334. A more liberal rule of construction against repeals by implication is adopted where acts are passed at the same session of the Legislature. Lewis Sutherland Stat. Con., Sec. 268; H. & T. C. R. R. Co. v. Ford, 53 Texas, 364.

Articles 2596 and 2597 of Revised Statutes, 1925, attempting to invest the Board of Regents with the "sole and exclusive management and control of lands set aside and appropriated to, or acquired by the University of Texas," and authorizing them to sell and lease

such lands and mineral lands, are invalid and void because in conflict with Article 7, Section 12, of the Constitution. To quote the constitutional provision, is to show the invalidity of Articles 2596 and 2597. Logan v. Stephens County, 95 Texas, 283; 83 S. W., 367; Chancey v. State, 84 Texas, 529, 19 S. W., 706.

*Smith & Gibson,* and *E. F. Smith,* for respondent Robison.

In support of Respondent's motion to dismiss we respectfully direct the attention of the Court to the case of Wagner v. Robison, 201 S. W., 171; Edwards v. Terrell, 93 S. W., 426; Opinions of Attorney-General, 1918–1920, p. 349.

Intervention is not permissible in the absence of statutory authority therefor even where a right or interest in the subject matter of the litigation exists. 38 C. J., 856; State v. Atlantic Coast Line R. R. Co., 67 Fla., 458; State v. Burkhart, 59 Mo., 75; Winstanley v. Peo, 92 Ill., 402; Harwood v. Quimby, 44 Iowa, 385; O'Brien v. Owensboro, 113 Ky., 680.

The Supreme Court of Texas has in two cases refused to permit an intervention in a mandamus action where the parties seeking to intervene asserted in their petition an interest in the subject matter of the suit. Colquitt-Tigner Mining Co. v. Rogan, 95 Texas, 452; Sherrod v. Terrell, 76 S. W., 422; Hewitt v. Craig, 86 Ky., 23.

An individual or a corporation on whom no duty rests to perform the acts sought to be enforced in mandamus proceedings or who has no substantial and peculiar interest in the subject matter of the litigation or *whose interest will not be affected by a judgment awarding the writ* can not intervene therein as a party. Peo v. Myers, 20 N. E., 417; United States v. Malmin, 272 Fed., 785; Towle v. State, 110 Ind., 120; Hewitt v. Craig, 86 Ky., 23; Harwood v. Quimby, 44 Iowa, 385; State v. Wright, 10 Nevada, 167.

Oil and gas are minerals. Minerals in place are land. This estate in land may be sold separate and apart from the remaining portion of the land. Stephens County v. Mid-Kansas Oil and Gas Co., 113 Texas, 160; Humphreys-Mexia Co. v. Gammon, 113 Texas, 247; Texas Co. v. Davis, 113 Texas, 321; Munsey v. Marnet Oil & Gas Co., 113 Texas, 212; Robison v. Jacobs, 113 Texas, 231. These decisions are but a further development of Benavides v. Hunt, 79 Texas, 383, and Texas Co. v. Daugherty, 107 Texas, 226.

The rule thus established has become a settled rule of property and an established public policy. Under its application the mineral estates in the public school, asylum and University lands have been

prospected and developed, millions of dollars invested by private interest and millions of dollars received by the public school, asylum and University funds in full reliance on the validity of the Acts of 1913, 1917 and 1925.

There is no prohibition or limitation of the time, terms or manner in which the Legislature may effectuate this policy and disposition of the lands. It is merely a declaration, binding upon the Legislature, to the effect that these lands must ultimately be disposed of by the Legislature for the designated purposes. Smisson v. State, 71 Texas, 231–233.

If any question is decided finally and for all time by our Supreme Court it is that the Legislature may provide by law for leases on these lands withdrawing the land from sale for that purpose. Smisson v. State, 71 Texas, 222; Swenson v. Taylor, 80 Texas, 584; Brown v. Shiner, 84 Texas, 505; Reed v. Rogan, 94 Texas, 177; Texas Central R. R. Co. v. Bowman, 97 Texas, 417; Imperial Irrigation Co. v. Jayne, 104 Texas, 395.

There is no valid and effective law authorizing the Board of Regents of the University of Texas to sell and lease mineral lands belonging to the University of Texas.

The leases authorized by Chapter 71, Acts of the 39th Legislature, Regular Session, constitute a conditional sale of the minerals. State v. Hatcher, 281 S. W., 192; Stephens County v. Mid-Kansas O. & G. Co., 113 Texas, 160; Humphreys-Mexia Co. v. Gammon, 254 S. W., 296.

The Hatcher case is final and conclusive authority to the effect that leases on University lands secured under the 1917 Act constitute a sale of a portion of the University land.

The Constitution does not forbid options to purchase University land, but the Act of 1925 does not provide for options, instead it provides for the sale of oil and gas leases and the leases so sold constitute a conditional sale of an estate in land. Stephens County v. Mid-Kansas O. & G. Co., 113 Texas, 160; Sawyer v. Robison, 268 S. W., 151.

The Constitution does not forbid the Legislature from authorizing an option to prospective purchasers of University land to buy said land. Reed v. Rogan, 94 Texas, 177; Texas Cent. R. Co. v. Bowman, 97 Texas, 417; Imperial Irrig. Co. v. Jayne, 104 Texas, 395; Lindlay v. Raydure, 239 Fed., 928.

The Legislature was commanded to sell the land but that command did not prevent the Legislature from enacting laws authoriz-

ing grazing leases and withdrawing the land so leased from sale during the period it was under lease. Brown v. Shiner, 84 Texas, 505; Swenson v. Taylor, 80 Texas, 584.

The Act under attack vests no discretion in the Land Commissioner as to when the mineral leases shall be sold. It provides that sales shall be made whenever there is land in demand and the time is fixed by the provisions of the Act at not less than once each month. Walker v. Tarrant County, 20 Texas, 16; Gulf, C. & S. F. Ry. Co. v. State, 120 S. W., 1028; James v. Walker, 141 Ky., 88, 147 Ky., 646; 12 C. J., 840; Smith v. Wortham, 157 S. W., 740.

The Legislature may confer upon the Land Commissioner power to adopt such rules and regulations as may be necessary to effectually administer a law enacted by the Legislature. Cincinnati, etc., R. R. Co. v. Clinton County, 1 Ohio State, 77; Georgia R. R. Co. v. Smith, 70 Ga. 694.

It is legitimate to include in one Act, and in the caption thereof unrelated matters, which unrelated matters, however, pertain to the general object to be accomplished by the law. The following cases sustain the point we make: Tadlock v. Eccles, 20 Texas, 792; State v. Deitz, 30 Texas, 511; Ex parte House, 36 Texas, 88; Breen v. State, 44 Texas, 305; Austin v. Railway Company, 45 Texas, 267; State v. Parker, 61 Texas, 267.

The conflict between the provisions of the 1925 Act and the provisions of the 1917 Act, (Chapter 83, Acts Regular Session 35th Legislature) is such as evidences an intention on the part of the Legislature to supersede the provisions of the 1917 Act by the provisions of the 1925 Act as to the method and manner of issuing oil and gas leases on University lands.

The resopndent, *J. T. Robison* also filed brief in pro. per.

The Act of 1925 is a valid statute. While these lands have been set apart for the encouragement of higher education this Court has said with reference to school lands under a very like constitution they are yet the property of the government just the same as if they had not been encumbered with that obligation and that the State can still make such use of them as may please it so long as there is no ultimate diversion from the main purpose. Greene v. Robison, 210 S. W., 498; T. C. Ry. Co. v. Bowman, 79 S. W., 295; Imperial Irrigation Co. v. Jayne, 138 S. W., 575; Smisson v. State, 71 Texas, 222.

That the Legislature has that power under the present state of the law is too well settled in our jurisdiction to require argument.

Stephens County v. Mid-Kansas Oil Co., 254 S. W., 290; Humphreys-Mexia Company v. Gammon, 254 S. W., 296; State v. Hatcher, 281 S. W., 192; Southern Oil Co. v. Colquitt, 69 S. W., 169.

The Act of 1925 follows the rules of the ancient mineral law as adapted to modern western civilization. These instruments have often been held by this Court to be the sale of a part of the land. That holding was announced in State ex rel. Attorney General v. Hatcher, State Treasurer, 281 S. W., 192.

Under the present state of the law in this jurisdiction relating to the sale of minerals in place (which includes oil and gas) there is no legal conclusion more firmly established than that such minerals are a part of the land and as such the owner, whether individual or government, can sell them or any portion thereof separate from the soil, Stephens Co. v. Mid-Kansas Oil Co., 254 S. W., 290; State v. Hatcher, 281 S. W., 192.

Since land is composed partly of dirt or soil, minerals, etc., it may be divided into separate estates or different units of value and be sold separately as such. Humphreys-Mexia Co. v. Gammon, 254 S. W., 296; Texas Co. v. Daugherty, 107 Texas, 226; State v. Downman, 134 S. W., 787; Washburn on Real Property, 5th Edition, Vol. 2, page 400; Tiffany on Real Property, Vol. 1, page 252.

The foregoing has been recognized as an inherent right of private ownership since long before the time when Mr. Blackstone wrote his commentaries upon the Common Law of England. It has been recognized as the right of the sovereign government of Texas in the disposition of its public lands since 1837. Active statutes have been in force on this subject in this State since April 14, 1883.

The Act of 1925 is the last expression of the Legislature upon the same subject, although its enactment was prior to the effective date of the new codification. When adopting the new codification the Legislature anticipated that possible situation and specially provided in Final Title, Section 21: "That nothing in this Act shall be construed to repeal or in any wise affect the validity of any law passed by this Legislature in its regular session."

The repugancy between the codified Art. 2597, R. S. 1925, and Chapter 71, Act Regular Session 1925, is so plain and so irreconcilable that the conclusion that the one had the effect to repeal the other is unavoidable. On this Relator's own citations are convincing. Neil v. Keese, 5 Texas, 23; Cole v. State, 170 S. W., 1036; Conly v. Daughters of the Republic, 156 S. W., 197; St. Louis B. & M.

R. R. Co. v. Marcofish, 221 S. W., 582; Sayles v. Robison, 129 S. W., 346; Austin v. Railway, 45 Texas, 266; McGrady v. Terrell, 98 Texas, 427.

The fact is that provision contains no element of delegated legislative authority. It is simply a duty imposed upon a public officer to determine a fact and the fact being determined such officer is required to perform a certain duty in regard thereto. Such imposition of duties upon public officers is common and without such power to so impose duties, the administrative departments of government could not function. Field v. Clark, 143 U. S., 649.

By the Act of 1925, the Legislature did not attempt to delegate legislative power upon the Land Commissioner. The Commissioner was the agency only appointed by the Legislature to ascertain facts in connection with his duty to carry out the provisions of the law. People v. Harper, 5 Fed., 641; Tilley v. S. F. & W. Ry. Co., 39 Ala., 247; Ingram v. State, 1 Ohio St., 77.

*Goree, Odell & Allen, Cockrell, McBride, O'Donnell & Hamilton,* for Board of Regents of the University of Texas, intervenors. *W. M. Odell* and *Dexter Hamilton* of counsel.

*Dan Moody,* Attorney General and *L. C. Sutton* and *R. J. Randolph,* Assistants, for intervenor, filed briefs attacking the validity of the mineral law of 1925.

*Claude Pollard,* Attorney General, and *C. W. Trueheart,* Assistant, filed briefs as *amici curiae,* supporting the validity of the mineral act of 1917.

*T. R. Freeman, S. W. Marshall* and *John L. Young* and also *Nelson Phillips* and *Chas. L. Black,* also *C. R. Wharton* and *H. M. Garwood,* also *Thompson, Knight, Baker & Harris* all *as amici curiae,* filed briefs supporting the validity of the mineral law of 1917.

*S. C. Padelford,* as *amicus curiae,* filed briefs attacking the validity of all leases of mineral rights in lands devoted to public education.

Mr. Justice GREENWOOD delivered the opinion of the court.

Relator George W. Theisen invokes the original jurisdiction of the Supreme Court to secure a mandamus requiring the Commissioner of the General Land Office to issue to him a permit conferring on him the exclusive right to prospect for and develop the petroleum

and natural gas upon and within 2560 acres of University land in Crane County.

The facts, plead and admitted, disclose that relator has complied with the requirements of the Act of 1917, authorizing the issuance of oil and gas permits on University and other public lands, under an application filed on the 29th day of March, 1926. The Land Commissioner refused relator's application on the ground that the Act of 1917 had been repealed by Chapter 71 of the Acts of the 39th Legislature, approved March 10, 1925.

The relator, joined by former Attorney General Moody, contests the validity of the Act of 1925, while the University of Texas, by its Board of Regents, as intervenor, urges the refusal of relator's application on the ground that neither the Act of 1917 nor the Act of 1925 authorizes a sale of University land as required by the Constitution, and on the further ground that each act undertakes an unconstitutional diversion of portions of the permanent University fund. The present Attorney General files an argument in support of the validity of the 1917 Act.

Relator also urges his right to the mandamus because the Act of 1925, if valid, does not repeal the terms of the 1917 Act which are relied on as entitling relator to his permit.

The principal question in the case is whether the Acts of 1917 and 1925 violate section 12 of article 7 of the Constitution which reads as follows:

"The land herein set apart to the University fund shall be sold under such regulations, at such times, and on such terms as may be provided by law; and the Legislature shall provide for the prompt collection, at maturity, of all debts due on account of University lands, heretofore sold, or that may hereafter be sold, and shall in neither event have the power to grant relief to the purchasers.

In order to get the full significance of section 12, it must be considered in the light of related sections of article 7.

Section 10 of article 7 commanded the Legislature to organize a university of the first class, as soon as practicable, and to provide for its support, maintenance, and direction.

Section 11 of article 7 provided:

"In order to enable the Legislature to perform the duties set forth in the foregoing Section, it is hereby declared that all lands and other property heretofore set apart, and appropriated, for the establishment and maintenance of "The University of Texas," together with all the proceeds of sales of the same, heretofore made or hereafter

to be made, and all grants, donations and appropriations that may hereafter be made by the State of Texas, or from any other source, shall constitute and become a permanent University Fund.

"And the same as realized and received into the Treasury of the State, (together with such sum, belonging to the fund, as may now be in the Treasury) shall be invested in Bonds of the State of Texas, if the same can be obtained, if not, then in United States Bonds, and the interest accruing thereon shall be subject to appropriation by the Legislature to accomplish the purpose declared in the foregoing Section.

"Provided, that the one tenth of the alternate sections of the lands granted to rail-roads, reserved by the state, which were set apart and appropriated to the establishment of the "University of Texas" by an act of the Legislature of February 11, 1858, entitled "An Act to establish The University of Texas," shall not be included in, or constitute a part of the permanent University fund."

Section 15 of Article 7 provided:

"In addition to the lands heretofore granted to the University of Texas, there is hereby set apart, and appropriated, for the endowment, maintenance, and support of said University and its branches, one million acres of the unappropriated public domain of the State, to be designated and surveyed as may be provided by law; and said lands shall be sold under the same regulations, and the proceeds invested in the same manner, as is provided for the sale and investment of the permanent University fund; and the Legislature shall not have power to grant any relief to the purchasers of said lands."

A brief summary will suffice to give an understanding of the terms of the Acts.

The Commissioner of the General Land Office is authorized, by the 1917 Act, to issue to the applicant or his assignee a permit conferring upon him an exclusive right, for a term not to exceed two years, to prospect for and develop petroleum and natural gas within the designated area of "all public school, University and Asylum land and other public lands, fresh water lakes, river beds and channels, islands, bays, marshes, reefs and salt water lakes, belonging to the State and all lands which may hereafter be so owned and all of said lands which have heretofore been sold or disposed of by the State or by its authority with a reservation of minerals or mineral rights therein as well as all lands which may hereafter be sold with the reservation of minerals." The permit is to be issued by the Commissioner on receipt of an application filed with the county clerk

if the land is in any surveyed area, or with the county surveyor if the land is in any unsurveyed area, together with a filing fee of one dollar and ten cents per acre and a certain affidavit. Actual work of development must begin within six months from the date of the permit; and upon petroleum or natural gas being developed in commercial quantities before the permit expires, the permittee is required to file a statement showing the development within thirty days, whereupon he becomes entitled to a lease on specified conditions, to be issued by the Commissioner, on application and payment of two dollars per acre. The lease is "for a term of ten years or less, as may be desired by the applicant, and with the option of renewal or renewals for an equal or shorter period, and annually after the first year after the date of the lease the sum of two dollars per acre shall be paid during the life of the lease, and in addition thereto the owner of the lease shall pay a sum of money equal to a royalty of one-eighth the value of the gross production of petroleum." For a gas well the royalty is one-tenth the value of the meter output of the gas disposed of from the premises. The royalties are paid monthly and all proceeds of permits and leases are to be credited to the permanent fund to which the land belongs. The Land Commissioner is given general supervision of the administration of the Act, with authority to adopt, amend and change such rules and regulations as he may consider necessary, provided the same are not inconsistent with the provisions of the Act. It is expressly provided that the issuance of permit or lease shall not prevent the sale of the surface without the minerals. The Act was amended in 1919 but the amendment relates to other public land than University lands.

The Act of 1925 requires that all unsold University land and the minerals in all of said land previously sold or thereafter to be sold with reservation of the minerals shall be subject to sale by the Land Commissioner in accordance with the Act's provisions and under such rules and regulations as may be adopted by the Commissioner in the proper execution of the purposes of the Act, provided that outstanding oil and gas permits and leases shall be unaffected and rights, obligations and penalties attaching thereto shall remain in full force. The Commissioner is authorized to sell oil and gas leases "not less than once each month, when there is land in demand, and at ten o'clock a. m. on the day fixed therefor." The price for the leases is "ten cents per acre in advance for the first year, and twenty-five cents in advance for the second year, and fifty cents per acre in advance each year thereafter until production is secured in paying .

quantities, but not to exceed five years, and a royalty of one-eighth of the gross production of the oil or the value thereof, produced and saved from the leased premises" delivered into such pipe lines as the lessee may have connected with his well or wells, and a like portion of the gas, and "in addition thereto such sum, if any, that one may pay therefor." After the Commissioner has advertised when the leases will be subject to sale, and has opened the sealed, separate, applications for each tract, the highest price offered secures the lease. A down payment is required of ten cents per acre, together with such additional sum as may be offered. When production in paying quantities is secured, the payment of further rental ceases, and "the payment of royalty begins." On securing paying production of oil or gas, the owner becomes "entitled to an absolute lease which shall run so long as the area produces in paying quantities," subject to performance of the lessee's obligations. Royalty is to be paid to the Land Office for the benefit of the University permanent fund on or before the 20th day of each month.

Bearing in mind the terms of the two acts, let us consider whether they conform to or violate the Constitution.

The two acts are mainly assailed on the ground that they provide for a permit or lease conferring on the permittee or lessee no greater right than a mere license, exercisable at the permittee's or licensee's option, to prospect for oil or gas, when the Constitution mandatorily requires the Legislature to dispose of the University lands by *sale* only and forbids the grant of a mere optional license.

The acts are further attacked, in the event they should be held to authorize sales of the lands, on the grounds: first, that the acts fail to provide the regulations, times, and terms under which the lands shall be sold; and, second, that the acts unconstitutionally divert portions of the permanent fund of the University by undertaking to authorize sales for considerations other than money.

The Constitution uses identical language with respect to the sale of public free school land as with respect to the sale of University land. Section 4 of article 7 begins, "The lands set apart to the public free school fund shall be sold under such regulations, at such times, and on such terms as may be prescribed by law." The language of section 4 has a definite, settled meaning under carefully considered opinions of judges as great as ever sat on this or any other court. The Court spoke through Chief Justice Gaines when it declared that the makers of the Constitution contemplated in providing that the public school lands be sold that the Legislature should

make such provision for the sale thereof "as in the opinion of the lawmaking department would yield the largest sum of money to the fund for which the lands were set apart." Glasgow v. Terrell, 100 Texas, 584, 102 S. W., 98. This language was used in refusing to strike down an act giving a lessee of public school land an exclusive preference right to purchase during the continuance of his lease. The Court, in an earlier opinion by Mr. Justice Stayton, had made clear that the Constitution was mandatory in prescribing sales as the mode of *ultimate* utilization of these lands, but the Court had positively rejected the proposition that the State was a mere trustee for the owner of these lands with a bare power of sale, saying that the lands belonged to the State as fully as before they were appropriated to public educational purposes. Smisson v. State, 71 Texas, 231, 232, 9 S. W., 112. Again, in Reed v. Rogan, 94 Texas, 181, 59 S. W., 255, the Court stated through Chief Justice Gaines: "The Constitution declares the will of the people that the lands shall be sold and makes it the duty of the legislative department of the government to provide for their sale; but as to the times, terms, and manner of sale the several Legislatures are vested with an unlimited discretion."

We cannot give a different meaning to the language of section 12 from that ascribed to section 4 of the same article. Hence, it is manifest that the purpose of section 12 was to secure for the University the amplest provision for its establishment, growth and maintenance, by leaving the legislative discretion unrestricted and unhampered in converting the University lands into money through any kind of sales, under such regulations, at such times, and on such terms as the Legislature might prescribe. The language used was wholly inconsistent with the idea that all the lands or all of any tract must be sold as an entirety. In Swenson v. Taylor, 80 Texas, 584, 16 S. W., 336, the Court, referring to public school lands, stated: "While the Constitution commands that the lands shall be sold, it leaves it entirely to the discretion of the Legislature when it shall be done. It fails to direct that the entire body of such lands shall be immediately sold, or that, until sold, no other disposition shall be made of them." Unlimited discretion to make the sales at one or more times, unlimited discretion to formulate regulations governing the sales, and unlimited discretion to fix terms for the sales necessarily implied power to divide the lands for purposes of sale. The Constitution trusted the Legislature to sell in such mode as would be most advantageous to the University's permanent fund.

We find no language in section 12 to forbid the Legislature to separately sell the mineral from the State's remaining estate in University lands. Even if the section had contained language raising a doubt about its meaning in this respect, we would have to resolve the doubt so as to uphold the legislative act.

We would look to the common law to arrive at the meaning of the constitutional command that the land be "sold." For, as has so frequently been pointed out, a constitution written and adopted by men who were most familiar with common law customs and principles should be interpreted by giving the words of the constitution the meaning they had under the common law. South Carolina v. United States, 199 U. S., 449, 50 L. Ed., 261, 4 Ann. Cases, 737.

Mr. Lindley traces far beyond the dawn of our present civilization the custom of sales for royalties of minerals, such as tin, iron, and coal, apart from the balance of a tract of land containing same, and points out that the vendee of the minerals acquired an estate in the land subject to the payment of debts.

Discussing the oldest mines in England, once worked by the Romans, Mr. Lindley says: "The right of working the tin mines of Cornwall was conferred upon all free tinners upon the render of a certain portion of the minerals raised to the owner or lord of the soil. This portion was called dish or toll tin, and was usually one-fifteenth of the production. Any tinner was allowed to 'bound' any unappropriated waste lands or enclosed lands which had formerly been waste subject to this custom. He 'bounded' the same by the delivery of toll tin to the lord of the soil. * * * The bounds might be sold or demised, and were frequently farmed out for a render called farm tin, and were liable for the payment of debts and legacies. The estate was in the nature of a chattel real, and passed to the executor." Lindley on Mines (2d Ed.) sec. 5, pages 9 and 10.

After tracing the custom to realize on minerals by means of separate sales thereof for royalty from ancient England to the American States, Mr. Lindley states: "Under the English law, rights of property in the surface and in the underlying mines might be shown to be in different owners. Nothing was more common than to sell or demise a piece of land excepting the mines. In like manner the different strata of the subsoil might be shown to be the subject of different rights. And there might be also in one mine different minerals which were the property of different persons. Thus, one person might be entitled to the iron, and another to the limestone. When the surface and underlying mines or the different strata of

the subsoil were differently owned, they were separate tenements, with all the incidents of separate ownership—a distinct possession and distinct inheritance; and the mines of each stratum might be held in fee simple, or fee tail, or otherwise, as in the case of surface property." Lindley on Mines (2d Ed.), sec. 9, pages 14 and 15.

One of the first acts of the Republic of Texas, (Paschal's Digest, Art. 4402, 5th Ed.), was upheld by the Supreme Court after being construed as reserving to the Republic certain minerals in certain lands on the grant of the remaining estates in such lands. Cowan v. Hardeman, 26 Texas, 217.

The Constitution itself expressly recognized that the mineral estate was capable of ownership and of sale separated from other estates in land, when it provided that the State "released to the owner or owners of the soil all mines and minerals that may be in the same." Section 7, article 14, Constitution.

The highest importance is always attached to the nearly contemporaneous construction of a provision of the Constitution by the Legislature, especially where participants in the legislation were framers of the Constitution, and where such construction has been acquiesced in and adhered to for a long term of years. State v. McAlister, 88 Texas, 286, 28 L. R. A., 523, 31 S. W., 187; Cox v. Robison, 105 Texas, 426, 150 S. W., 1149; Great Southern Life Insurance Company v. City of Austin, 112 Texas, 1, 243 S. W., 778. In McDowell v. McBride, 92 Texas, 240, 47 S. W., 524, the Court said: "Soon after the adoption of the Constitution of 1876 the Legislature, in enacting the law of which said article is a part so construed the constitutional provision, and it is the duty of the courts to so far defer to such construction as to hold the act constitutional unless it is clearly not."

The Supreme Court of the United States, through Chief Justice Taft, says: "This Court has repeatedly laid down the principle that a contemporaneous legislative exposition of the Constitution, when the founders of our government and the framers of our Constitution were actively participating in public affairs, acquiesced in for a long term of years, fixes the construction to be given its provisions." Myers v. United States, 272 U. S., 174, 176, 71 L. Ed. 190.

The Legislature, by an Act approved April 12, 1883 (Chapter 88, p. 85), made provision for the sale and lease of lands set apart to the common school, University and asylum funds. Section 14 of the Act provided: "The minerals on all lands sold or leased under this act are reserved by the State for the use of the fund to which

the land now belongs." By Act approved April 14, 1883 (Chapter 97, page 100), the Legislature provided for the sale of the minerals in the public school, University and asylum lands in consideration of a mineral royalty, towit: "five per cent of the gross receipts." The Journal of the Constitutional Convention of 1876 and the House and Senate Journals show that several members of the Constitutional Convention participated in the passage through both houses of the Acts of April 12th, 1883, and of April 14th, 1883. Indeed, one of the authors of Article 7 was a member of the House supporting the bill providing for the separate sale for a royalty of minerals in these public lands.

Without reviewing the further history of legislation in Texas, it will suffice to repeat what this Court declared in Cox v. Robison, 105 Texas, 426, 150 S. W., 1149, in the following language: "Since the present Constitution was adopted, as evidenced by different enactments beginning with the Act of April 12, 1883, the Legislature has proceeded upon the view that it interposed no obstacle to legislation providing for the reservation of the minerals in these lands." On that premise the Court announced familiar constitutional law in saying: "While not binding upon the Courts, an unchallenged construction of a provision of the Constitution by that department of the government (i. e. the Legislature) extending over a period of more than a quarter of a century should be heeded and given effect, unless manifestly wrong."

Nothing is plainer to us than that, the Constitution having imposed the duty on the Legislature to sell University lands to the best advantage of the University's permanent fund, there was no lack of legislative power to sell the lands containing minerals in the way customarily used to avoid sacrifice of the value of the minerals. Since at the date of the adoption of the Constitution and for prior centuries minerals were usually converted into money by sales working a severance of the mineral estate, consummated by means of writings commonly called leases, for stipulated royalties, the Legislature was plainly empowered to consummate in that manner separate sales of the minerals in the University lands. Any other view would defeat the cardinal purpose of the framers of the Constitution to realize as great a fund as possible from these lands—including their minerals—for the University.

There seems to be nothing in the Constitution preventing the Legislature from realizing money for the public schools or for the University by means of the sale of licenses to explore public school

or University lands for minerals, should the Legislature deem it wise to adopt such a policy. But, the question as to whether the Legislature possesses any such power is purely abstract. For, under the thoroughly settled law of this State, the Acts of 1917 and of 1925 operate not to grant mere licenses to explore for minerals but instead they authorize conveyances by the State of minerals in place and hence the Legislature in passing the Acts obeyed the command of the Constitution to sell the University lands.

In order to arrive at a correct understanding of the rights of a permittee or lessee, under the first instrument issued under these Acts, we must consider his rights under the succeeding instrument, since the right to the suceeding instrument vests in him under the very first instrument as completely as the privilege of exploration, though, of course, subject to the conditions imposed by the statutes. The right to explore, to produce, and to appropriate relates back to, and is derived from, the initial permit or lease.

Thus viewing the rights of the permittee or lessee, we find that each Act authorizes the sale, at stipulated prices, of a permit in the one case and of a lease in the other, which invests the permittee or lessee and his assigns, on performance of stated obligations, with the exclusive right to explore certain lands for oil and gas, for a fixed term of years, and upon the discovery of oil or gas in commercial or paying quantities, to produce and appropriate same, so long as profitable production may continue. While the Act of 1917 does not in terms provide that the right of production and of appropriation shall continue as long as oil or gas is produced in paying quantities, as does the 1925 Act, yet the provision of the Act of 1917 for successive lease renewals, at the option of the lessee or his assign, necessarily has the same effect as an express provision that the lease shall remain in force as long as oil or gas may be profitably produced.

Under our interpretation of the Acts, every question raised as to either Act not authorizing a sale of an interest in land was determined by this Court in the case of Stephens County v. Mid-Kansas Oil & Gas Company, 113 Texas, 168, 172, 29 A. L. R., 566, 254 S. W., 290, when the Court said: "Ownership of gas and oil in place means having the exclusive right to possess, use, and dispose of the gas and oil. * * * Notwithstanding the distinction attempted to be drawn in the decisions, we cannot conclude otherwise than that there is no real difference in the title conveyed, whether an instrument takes the form of a grant of the exclusive right to mine

and appropriate all of a certain mineral—as in Benevides v. Hunt, supra—or takes the form of a demise of the land, for the sole purpose of mining operations, coupled with a grant of the exclusive right to produce and dispose of the mineral—as in this case—or takes the form of a grant of the mineral with the exclusive right to mine for, produce, and dispose thereof—as in Texas Company v. Daugherty, supra (107 Texas 236). The results are substantially the same to all parties at interest, whether the one or other form of instrument be used. Why hold that instruments in different forms create different estates, where there is no difference in fact with respect to that of which each divests the grantor, his heirs, or assigns, nor with respect to that with which each invests the grantee, his heirs or assigns?"

In legal effect, the grants authorized by the Acts are not essentially different from the grant in the ordinary oil and gas lease, such as was before the Court in the Stephens County case. The ordinary lease confers first an option to explore for oil or gas, but, after discovery of oil or gas in paying quantities, it confers the right to produce and appropriate the oil or gas. It is immaterial that the right to appropriate the oil or gas under the 1917 and 1925 Acts follows and does not precede the final lease. Because, as already pointed out, the permittee or lessee may compel the execution of the final lease on performing the obligations which the Act imposes on him. Under the ordinary lease, the right to continue to produce and appropriate oil or gas is contingent on performance of similar obligations. It is unthinkable to treat the ordinary lease as conveying minerals in place and to refuse to give that effect to the grants authorized by these Acts.

So far as the immediate question now before the Court is concerned, it was decided in the opinion by Chief Justice Stayton, who was a member of the convention framing the Constitution, when it was determined that the grant of an exclusive right to mine the coal underlying a tract of land was not the grant of an incorporeal right but was the grant of land. Benevides v. Hunt, 79 Texas, 383, 15 S. W., 396.

The Supreme Court again decided this question adversely to the attack on these statutes in the case of State v. Hatcher, 115 Texas, 336, 281 S. W., 192. The opinion of the Commission of Appeals in that case was adopted and hence is authoritative. After stating that the sole question to be determined was whether royalties paid on leases of University land under the 1917 Act belonged to the

University's permanent fund, the opinion says: "This brings us to a consideration as to whether or not these royalties are proceeds of the sale or other taking of University lands." On the authority of the Stephens County case, the conclusion was announced: "It seems quite clear that the University lease was in effect a sale of a portion of the land."

In Sawyer v. Robison, 114 Texas, 437, 268 S. W., 151, it was determined that an oil lease under the 1917 Act "occupies the same legal status as a grant to land. It concedes to the lessee and his assigns all the right and title of the state to the estate dealt with under the conditions stated therein, the same as a patent conveys the title of the state to land."

We find no tenable ground for striking down the 1925 Act and upholding the 1917 Act. It is argued that the Constitution, in requiring the University lands to be sold, forbids their conversion into anything but money, and that part of the consideration for the oil or gas sold under the 1925 Act may be paid in a fraction of the oil or gas produced. It is unnecessary for us to consider whether an act for the sale of minerals in University lands would be valid if it authorized a part of the consideration to be paid in a mineral which all men know is readily convertible into money instead of in money. For, as we construe the Act of 1925, it just as plainly requires the entire consideration for the leases it authorizes to be paid in money, or its equivalent, as does the Act of 1917. While section 2 of the Act of 1925 specifies as a part of the consideration for the lease "a royalty of one-eighth the gross production of the oil or the value thereof," and makes a similar provision as to gas, yet section 7 mandatorily provides: "Royalty and all other sums shall be due and payable to the State at Austin, Texas, and shall be *paid* to the Commissioner of·the General Land Office and he shall *transmit all remittances in the form received* to the State Treasurer, who shall *credit* the permanent University fund with all *amounts* received from royalty. *All payments* shall be in the form of cash, bank draft on some State or National Bank in Texas, or post-office, or express money order, or such other form as may be collectible in Austin."

The Legislature could not have more plainly manifested the intent to require the proceeds of these leases to reach the Land Commissioner and the State Treasurer in the form of money or of an accepted and customary medium for the transfer of money. Both Acts authorize mineral sales for money to swell the University's

permanent fund, and the considerations exacted comply with constitutional requirements even when strictly construed.

The 1925 Act is challenged as delegating authority which can only be validly exercised by the Legislature to determine when the land shall be sold because the Act provides that sales shall be made "not less than once each month, when there is land in demand, and at ten o'clock a. m. on the day fixed therefor."

As we interpret the Act, the Land Commissioner is mandatorily required to sell oil or gas in any University land upon receipt of a request to place same on sale. The Land Commissioner seems to have uniformly so administered the Act, saying in his answer: "In this connection Respondent avers that he has construed that provision of the Act as being mandatory wherein it is provided that said lands shall be sold 'not less than once each month, where there is land in demand, and at 10 o'clock A. M. on the day fixed therefor' as requiring the Land Commissioner to advertise for sale mineral leases on any of the University lands whenever anyone files an application with him asking that leases on certain lands be sold. Respondent is of the opinion that he has no discretion in the matter, but whenever it is called to his attention in an affirmative manner that there is a demand for leases on certain land it is his duty to advertise the lease or leases for sale and to fix a time when the same shall be sold within not more than one month from the time he was informed that there was a demand for said leases."

Since land or minerals cannot be sold without a purchaser, and since the Legislature has determined that from and after the date the Act of 1925 became effective the oil and gas in any tract for which there was an offer to purchase should be sold on specified terms, within thirty days at 10 o'clock on the day set apart to conclude a sale, the Legislature has completely fulfilled the constitutional requirement of prescribing when this mineral estate in the land shall be sold, and it was plainly competent for the Act to empower the Commissioner to make such regulations as the Act authorized in its mere administration in order that the legislative will might be accomplished. As declared in 12 Corpus Juris, page 840: "While, however, the Legislature may not delegate the exercise of its discretion as to what the law shall be, it may confer discretion in the administration of the law."

The leases under either act accomplish no unconstitutional diversion of the University's permanent fund. They do not authorize the purchaser to take and use seven-eighths or any other mere fractional

part of the oil or gas in the land leased. The purchaser instead buys *all* the oil and gas, for a stipulated price, part of the price being measured by the value of a certain fraction of the *produced* oil and gas, which is a very different thing from the value of that fraction of the oil and gas in place. The leases convey all the oil and gas in granting the right to find, produce, and appropriate *all* of them, in consideration of the payment of stipulated sums and also the value of a stated fraction of the oil and gas produced. The oil and gas when appropriated form no part of the University's permanent fund. While in place, before being sold, the oil and gas were potential assets of the fund. Like any other seller, the State, after parting with its title, no longer owns that which it has sold, but the State receives and turns over all the proceeds of sale when it receives and turns into the permanent University fund the royalties and other payments required by the acts. As a result of the sale, the purchaser owns the oil and gas, and the University permanent fund owns the entire proceeds of their sale.

As a matter of course, the State can sell no part or portion of its lands without diminishing the value of what remains. Should the State sell 80 acres out of an 160 acres of uniform value, that which remains would be worth only half the value of the entire tract. But, the State is none the poorer in retaining 80 acres and the proceeds of 80 acres. Exactly the same thing is true when the mineral estate in land is sold separately from the remaining estates, and it belies the experience of mankind throughout the ages to assume that there is any more profitable mode of sale for the realization of the full value of mineral bearing land.

In Barringer and Adams, Mines and Mining, at page 36, it is said:

"The form of the conveyance is unimportant. It makes no difference that it is called a lease, and that its terms are those for leasing real estate. If it shows an intention to convey *all* of the specified mineral in the particular land, it effects a sale or absolute conveyance thereof.

"If the instrument shows an intent, it is none the less a sale because a term of years is prescribed within which the mineral must be taken out. Nor is the nature of the grantee's estate changed by the fact that he fails to mine during that term. There is in such case a sale to him, not a lease; but a reversion takes place at the end of the term of the grantor.

512

"The fact also that the purchase money depends upon the amount of coal mined is of no moment in determining the nature of the estate. The question is whether all the coal is conveyed; if so, there is a sale thereof."

After the 1925 Act became effective, the Legislature plainly directed that all future sales of University lands or of minerals in such lands should be made in the mode, and under the regulations prescribed by that Act. Such is the express command of Section one of the Act. Such is the necessary effect of the language of section one in specifying what shall be unaffected by the Act. It was proper to include the 1917 Act in the Revised Statutes, as it was proper not to repeal it outright, because it continued in full effect as to certain classes of lands other than University lands.

Relator having made no attempt to comply with the only act which governed the sale of minerals in University lands, at the date of his application, which act is free of constitutional infirmity, the Land Commissioner followed the law in rejecting relator's application for a permit, and the mandamus applied for should be and is refused.