## GROUP NO. ONE OIL CORPORATION v. BASS, Collector of Internal Revenue.

### No. 1176.

District Court, W. D. Texas, Austin Division. Feb. 19, 1930.

Baker, Botts, Parker & Garwood, of Houston, Tex., for plaintiff.

C. M. Charest, Gen. Counsel, Bureau of Internal Revenue, and Ottamar Hamele, Sp. Atty., Bureau of Internal Revenue, both of Washington, D. C., for defendant.

WEST, District Judge.

The submission of the case is on its merits, an agreed statement of facts, and waiver of jury. Plaintiff sues for refund of taxes as unlawfully collected because assessed on incomes received arising from instruments styled "Oil and Gas Leases" executed by the state of Texas, lessor, to the plaintiff, of certain described lands belonging to the state of Texas and the University of Texas, by the terms of which plaintiff acquired all of the oil and gas to be produced, the state to receive therefor a consideration in cash of an amount equal to the value of one-eighth of the gross quantity of oil produced, and an amount equal to the value of one-tenth of gas produced and sold. Plaintiff's net income from these two sources for the years 1925, 1926, 1927, and 1928 was taxed by the United States, and the amount $733,397.51 paid.

The questions presented are whether or not the net incomes realized by plaintiff lessee from oil and gas produced on lands belonging to the state and University of Texas are (1) exempt from taxation by the United States by the terms of the state annexation compact between the Republic of Texas and the United States, or (2) lawfully taxable by the terms of the Constitution of the United States.

Upon the close of the admission of evidence at the trial each party moved for judgment. The material facts being admitted, the disputed issues are those of law. The instruments are "Oil and Gas Leases," respectively, "No. 856" and "No. 8607," copies of which are attached to the original petition as Exhibits "A" and "B."

The truth of allegations of fact in plaintiff's original petition is conceded by stipulation, except immaterial matters in paragraph 9, and in other immaterial particulars.

The leases are executed by the state, through the Commissioner of the General Land Office, to plaintiff's assignors. Some of the provisions, in brief, are: " * * * Does hereby grant and lease * * * " for 10 years, with right to enter upon said land at all times during the life of the lease for the purpose of mining, drilling, and operating for petroleum or gas, to erect buildings, pipe lines, storage, on condition: "(1) The owner of the rights herein conveyed shall pay to the State of Texas * * * a sum of money equal to a royalty of one-eighth of the value of the gross production of petroleum and shall pay a sum of money equal to 10 per cent. of the value of all gas sold. * * * (2) The value of any unpaid royalty or royalties and any sum or sums due the State * * * " are a prior lien on all production. (3) Reasonable diligence is required in drilling and developing, with "bona fide effort to put out the produce of each producing well during the life of this lease, * * * " to drill offset wells. "(4) The owner of rights herein conveyed shall have the exclusive right * * * " to drill during the life of the lease and also right of way to lay pipe lines. (5) The owner of the lease, upon failure to perform enumerated requirements or to comply with any regulations adopted by the Commissioner of the General Land Office, will subject the lease to forfeiture. "(6) * * *. (7) * * *." (8) All terms and conditions shall extend "to the heirs, successors and assigns" of the lessee. The leases are signed by the Acting Commissioner of the General Land Office of Texas, with seal.

The lands leased first acquired status as property as being part of the domain of the King of Spain; then by succession passed to

the Republic of Mexico; thence to the republic of Texas; and, finally, to the state of Texas and the University of Texas. The vacant and unappropriated lands of the republic were conceded by the United States, in the admission compact with the republic of Texas, as vested in the state of Texas, "to be disposed of as said State may direct."

Plaintiff's claims for refund are: That the lands leased were originally acquired and held by the republic of Texas in its sovereign capacity; and that by the treaty compact with the United States the right of the state of Texas to dispose of such lands was ceded without condition, other than that the United States should not be held for any debts or liabilities of the republic. Therefore, to tax the lands or the proceeds derived from their sale or lease would be to burden and hinder the state in the exercise of its treaty right to dispose of its lands as it might direct. Likewise a tax imposed on the incomes of plaintiff lessee derived therefrom, being the means and instrumentalities used by the State of Texas in the exercise of its unlimited right of disposal of its lands, would burden, impair, hinder, limit, and destroy such right.

The defendant contends: That only strictly governmental activities of a state are immune from federal taxation; that in this case neither the development of oil and gas by the State, nor the maintenance by the state of its university, are strictly governmental activities. Therefore, plaintiff's incomes, being profits made in disposing of oil purchased from the state, are subject to the federal tax assessed and collected.

The ability and industry of counsel have exhausted all sources of authority. The issues are narrowed to essentials. Stated in question form, they are:

First. What is the effect of the treaty guaranty on the right of the state of Texas to dispose of the lands of the republic of Texas?

Second. Are the so-called leases, and the plaintiff lessee-purchaser, the means and instrumentalities used by the state to develop its land for the state and its university?

Third. Is the maintenance by the state of its university a strictly governmental activity?

Fourth. Do the taxes on the incomes derived by plaintiff as lessee-purchaser of state lands, being the state's means and instrumentality, impair and abridge the state's right to dispose of its lands?

First question answered: The state of Texas came into being through resolutions of the Congress of the United States and the Convention of the Republic of Texas, the republic thus becoming a state. The resolutions are found in 5 U. S. Statutes 797; 9 U. S. Statutes 108; Gammel's Laws of Texas, vol. 2, pp. 1200, 1225, and 1228. The specific guarantee to the State is as follows:

"2. And be it further resolved, that the foregoing consent of Congress is given upon the following conditions, and with the following guarantees, to-wit:

"Second. Said State * * * shall also retain all the vacant and unappropriated lands lying within its limits, to be applied to the payment of the debts and liabilities of said Republic of Texas, and the residue of said lands, after discharging said debts and liabilities, to be disposed of as said State may direct; but in no event are said debts and liabilities to become a charge upon the Government of the United States."

No issue of fact is in the record to indicate the existence of any debts or liabilities of the republic of Texas. It is therefore assumed that the state is granted the right to dispose of its landed domain as it "may direct." The Legislature of the state, by mandate of the Constitution, was directed to establish and provide for the support and maintenance of the University of Texas. See state Constitution 1876, art. 7, §§ 10 to 15, inclusive. One million acres of land, in addition to previous grants, were set apart for the support of the university.

The Legislature passed laws concerning the disposal of the university lands. The act providing terms under which permits, leases, and sales could be made appeared in chapter 83 of Acts of the Thirty-Fifth Legislature, March 16, 1917, and is still effective. It applies to the methods used in this case.

Pursuant to the treaty grant, the state, through its fundamental law, directed that a million acres of land be set apart by the Legislature for the support of the university. They were so set apart. Acting through its Legislature, the state directed that the oil and gas underlying its university lands be developed by means of sales of oil in place, to be paid for only when reduced to possession by capture, or, in the words of the lease, when "produced." The right so to dispose of these essential elements of land through the means employed is included by the words of the treaty compact. There is no room for construction or interpretation of the words con-

ferring unlimited right to dispose. They are clear and all embracing and should be given effect. The right being without limitation, none can be placed by the United States on the means and instrumentalities used by the state in disposing of its lands.

The court holds that the effect of the treaty compact is: That the state could dispose of its lands in the exercise of a strictly governmental activity or otherwise as it might direct; and therefore the United States has no power to impede or hinder the means and instrumentalities used by the state in exercising its unlimited right of disposal.

█ Second question answered: The method used by the state to develop the oil and gas on its university lands here being developed was to make the lease-purchase contracts with plaintiff, the incomes resulting therefrom to plaintiff being taxed, collected, and sued for herein. It is common knowledge that search for oil and gas is highly speculative. Oil drilling requires the employment of specialists, geologists, chemists, machinists, and the like. Oil when found must be "produced" at the well's mouth and sold there or at a distance, by transport in tank cars or pipe lines, to refineries, or to world markets. A state might embark in the business of producing oil, but to do so would be unusual. The oil lease method of development by landowners is customary.

Accordingly, the court holds that the state of Texas, in the exercise of a common sense judgment, selected plaintiff, by the lease contracts in evidence, as the means through which to explore and develop the oil and gas underlying its university lands. This character of contract is considered by authority as being legitimate "means and instrumentalities" when used by the United States and the states in like development. Choctaw, Okl. & Gulf. Railroad v. Harrison, 235 U. S. 292, 35 S. Ct. 27, 59 L. Ed. 234; Indian Territory Illuminating Oil Co. v. Okla., 240 U. S. 522, 36 S. Ct. 453, 60 L. Ed. 779; Gillespie v, Okla., 257 U. S. 501, 42 S. Ct. 171, 66 L. Ed. 338; Jaybird Mining Co. v. Weir, 271 U. S. 609, 46 S. Ct. 592, 70 L. Ed. 1112; Metcalf v. Mitchell, 269 U. S. 523, 524, 46 S. Ct. 172, 70 L. Ed. 384.

█ Third question answered: The rule of the common law that it is the duty of the parents to educate the child, if considered as in effect at the time of the adoption of the Constitution of the United States, has generally been supplemented by constitutional and statutory enactments in the several states which recognize that education is one of the functions of government, and the public school system is now a department of the government. "The primary purpose of the maintenance of the common school system is the promotion of the general intelligence of the people constituting the body politic, and thereby to increase the usefulness and efficiency of the citizens, on which the government of society depends." 24 R. C. L. 558. Education as a governmental activity is exercised by the federal government to a limited extent. The states generally have by statutes assumed the public education of its citizens. This has become so uniformly widespread as to warrant the conclusion that public education as a governmental function was not included in the constitutional grant of powers to the Federal government, but was reserved to the sovereign states.

South Carolina v. United States, 199 U. S. 437, 26 S. Ct. 110, 59 L. Ed. 261, 4 Ann. Cas. 737, declares that strictly governmental activities must be classified by recourse to the common law in interpreting the Constitution and "also to the position of the framers of the instrument, and what they must have understood to be the meaning and scope of the grants of power contained therein." The expression is of doubtful application to the facts of this case.

Texas was admitted to the Union in 1845, fifty-five years after the adoption of the federal Constitution, and, unlike other states, retained its unappropriated public domain with unlimited right of disposal. Plaintiff and the lease contracts are the means used by the state to dispose of its lands.

In South Carolina v. United States, the issues were whether engaging in the business of dispensing liquor by the state was a private business or the exercise of a strictly governmental activity, and whether the national government's power to impose license taxes on the private business of that character applied where the state was conducting such business. The question here is whether or not public education became a strictly governmental activity by virtue of statutes of the republic in effect at the time that Texas was admitted to the union, and the constitutional and legislative enactments since.

The Congress of the republic of Texas, in the exercise of the governmental function, passed an act of date January 6, 1839 (2 Gammel's Laws of Texas 134) directing the President to set aside 50 leagues of land to establish two colleges thereafter to be created. Texas came into the Union in December,

1845, and passed an act February 11, 1858 (4 Gammel's Laws of Texas 1020), establishing the University of Texas, appropriating $100,000 therefor, and setting aside additional lands for the purpose. This act recites that it had been the fixed design of the people of the republic and of the state that there should be established an institution for the instruction of the youth of the land, to be so endowed as to be within the reach; of rich or poor a thorough education, as a means to attach young men to the institutions of the state, and that the liberties of the people might be encouraged. The state Constitution of 1876 directed the Legislature to provide for the maintenance of the University of Texas. Pursuant thereto, the present University of Texas was created, March 30, 1881 (9 Gammel's Laws of Texas 171), to be governed by eight regents nominated by the Governor and appointed by and with the advice of the Senate, the government of the university being subject at all times to the control of the Legislature. The university is not a corporation. Its affairs are directed and controlled exclusively by the state. The title to what is commonly called university lands is in the state. Appropriations for maintenance and operation are regularly made by the Legislature. The university is in fact and in law a branch of the state government. See cases cited in 24 Ruling Case Law, supra.

The authorities give no clear definition of "governmental activities," nor the degree of strictness required. The courts determine the question from the facts in the particular cases. No principle of the common law effective at the time of the adoption of the Constitution in 1791 is cited as holding that public education is or is not a strictly governmental activity. South Carolina was conducting a private business, buying and selling liquor, therefore liable for the taxes levied. Lacking law or fact as of the effective period, the statutes of the states supersede the common law, if any, and should control. It is common knowledge that the states, by constitutional and legislative enactments and appropriations, are educating their people— unquestionably governmental activities—but are they "strictly" so? Education is not bought and sold like physical commodities. It is fair to say that public education by the states is the rule and private education the exception. A principle of construction that the sovereign states could in future exercise only such sovereign rights as were known to the common law, or the law of nations, at

the time of the adoption of the Constitution, means a rigidity out of harmony with judicial expressions to the effect that our Constitution is flexible and continues to meet and adjust itself to the new and rapidly changing conditions.

Important facts worthy of repeating are that public education was in the minds of the fathers of the republic of Texas in January, 1839, when the President was directed by the Congress to set aside 50 leagues of land to establish public colleges. Lands and funds were appropriated by the Legislature of the state of Texas in 1858. A million acres were set apart by constitutional mandate in 1876 for the benefit of the university, established by the Legislature in 1881, and continued maintenance since.

The facts here differ in material particulars from those in South Carolina v. United States. The rule that strictly governmental activities may be ascertained only in the light of conditions of law and fact existing at the time of the adoption of the Constitution are not applicable to the case at bar.

Accordingly, the court holds that since 1839 the republic and the state of Texas evidenced an earnest intention, by appropriations of lands and funds, to adopt education as a governmental policy; and that since 1881, by the constitutional mandate and legislative enactment, the state, through its university and public schools, has undertaken the education of its peoples as a strictly governmental activity.

Fourth question answered: This question is answered in the affirmative by the cases cited in support of the reply to question 2.

The defendant contends that there is no evidence in the record to show that either the state or university would suffer any injury by the tax levy. After reviewing all the decisions of the Supreme Court bearing on the Indian lease contracts and Oklahoma's attempt to levy a tax on a lessee's income in Gillespie v. Oklahoma, 506 of 257 U. S., 42 S. Ct. 171, 172, 66 L. Ed. 338, supra, the opinion closes with the following statement: Whether this property could be taxed in any other form or not, it cannot be reached as profits or income from leases such as those before us. The same considerations that invalidate a tax upon the leases invalidate a tax upon the profits of the leases, and, stopping short of theoretical possibilities, a tax upon such profits is a direct hamper upon the effort of the United States to make the best terms

\* \* \* for its wards"—citing Weston v. Charleston (1829) 2 Pet. (27 U. S.) 449, 7 L. Ed. 481, Marshall, Chief Justice.

The cases hold that a tax imposed upon incomes from a lease of the character in evidence is a direct hamper on the efforts of the lessor sovereign to make the best terms for itself or its beneficiary. The Court finds that there is evidence in the record to give application to the principle declared. A .careful study of the cases cited, and those cited in the opinions rendered, is convincing that all principles of law arising from the facts in this case have been considered.

The plaintiff relies on Gillespie v. Oklahoma, supra, as authority directly in point and of controlling weight as to the law. The defendant argues that South Carolina v. United States, supra, controls, because that case declares that states that engage in private business are subject to the federal excise tax, and that only strictly governmental activities are free from federal tax. In ruling that the maintenance of its state university was strictly a governmental activity, and therefore free of the tax, the court has stated the reasons upon which they are based.

From the foregoing it results that the plaintiff is entitled to the refund of taxes, collected by the defendant in the amount sued for. Form of judgment in accordance may be submitted for entry within ten days from date hereof. A list of cases considered is appended as a footnote.[1]

[1] Cases Considered: Ambrosini v. United States, 187 U. S. 1, 23 S. Ct. 1, 47 L. Ed. 49; New York ex rel. Bank of Commerce v. Com'rs of Taxes & Assessments, 67 U. S. (2 Black) 620, 17 L. Ed. 451; Bank Tax Case, 69 U. S. (2 Wall.) 200, 17 L. Ed. 793; Childers v. Beaver, 270 U. S. 555, 46 S. Ct. 387, 70 L. Ed. 730; Choctaw, Okla. & Gulf Ry. Co. v. Harrison, 235 U. S. 292, 35 S. Ct. 27, 59 L. Ed. 234; Collector v. Day, 78 U. S. (11 Wall.) 113, 20 L. Ed. 122; Dobbins v. Erie County, 41 U. S. (16 Pet.) 435, 10 L. Ed. 1022; Farmers' & Mech. Nat'l Bank v. Dearing, 91 U. S. 29, 23 L. Ed. 196; Flint v. Stone Tracy Co., 220 U. S. 107, 31 S. Ct. 342, 55 L. Ed. 389, Ann. Cas. 1912B, 1312; Gillespie v. Oklahoma, 257 U. S. 501, 42 S. Ct. 171, 66 L. Ed. 338; Grayburg Oil Co. v. State of Texas, 278 U. S. 582, 49 S. Ct. 185, 73 L. Ed. 519; Heiner v. Colonial Trust Co., 275 U. S. 232, 48 S. Ct. 65, 72 L. Ed. 256; Howard v. Gypsy Oil Co., 247 N. S. 503, 38 S. Ct. 426, 62 L. Ed. 1239; Indian Territory Illum. Oil Co. v. Oklahoma, 240 U. S. 522, 36 S. Ct. 453, 60 L. Ed. 779; Jaybird Mining Co. v. Weir, 271 U. S. 609, 46 S. Ct. 592, 70 L. Ed. 1112; Johnson v. Maryland, 254 U. S. 51, 41 S. Ct. 16, 65 L. Ed. 126; Large Oil Co. v. Howard, 248 U. S. 549, 39 S. Ct. 183, 63 L. Ed. 416; Long v. Rockwood, 277 U. S. 142, 48 S. Ct. 463, 72 L. Ed. 824; Metcalf & Eddy v. Mitchell, 269 U. S. 514, 46 S. Ct. 172, 70 L. Ed. 384; McCulloch v. State of Maryland, 4 Wheat. 316, 4 L. Ed. 579; Northwestern Mut. Life Ins. Co. v. Wisconsin, 275 U. S. 136, 48 S. Ct. 55, 72 L. Ed. 202; Osborn v. Bank, 9 Wheat. 738, 6 L. Ed. 204; Panhandle Oil Co. v. Knox, 277 U. S. 218, 48 S. Ct. 451, 72 L. Ed. 857, 56 A. L. R. 583; Pollock v. Farmers' Loan & Trust Co., 157 U. S. 429,-15 S. Ct. 673, 39 L. Ed. 759; Shaw v. Gibson-Zahniser Oil Corp., 276 U. S. 575, 48 S. Ct. 333, 72 L. Ed. 709; South Carolina v. United States, 199 U. S. 437, 26 S. Ct. 110, 59 L. Ed. 261, 4 Ann. Cas. 737; Van Brocklin v. Tennessee, 117 U. S. 151, 6 S. Ct. 670, 29 L. Ed. 845; Weston v. Charleston, 27 U. S. (2 Pet.) 449, 7 L. Ed. 481; Williams v. City of Talladega, 226 U. S. 404, 33 S. Ct. 116, 57 L. Ed. 275; Burnes National Bank v. Duncan, 265 U. S. 17, 44 S. Ct. 427, 68 L. Ed. 881; California v. Central Pacific Ry. Co., 127 U. S. 1, 8 S. Ct. 1073, 32 L. Ed. 150; Thomson v. Union Pacific R. R., 9 Wall. 579, 19 L. Ed. 792; Union Railroad Co. v. Peniston, 18 Wall. 5, 21 L. Ed. 787; United States v. Perkins, 163 U. S. 625, 16 S. Ct. 1073, 41 L. Ed. 287; Plummer v. Coler, 178 U. S. 115, 20 S. Ct. 829, 44 L. Ed. 998; Veazie Bank v. Fenno, 8 ,Wall. 533, 19 L. Ed. 482; Snyder v. Bettman, 190 U. S. 249, 23 S. Ct. 803, 47 L. Ed. 1035; Theisen v. Robison, 117 Tex. 489, 8 S. W.(2d) 646; State of North ,Dakota v. Olson (C. C. A.) 33 F.(2d) 848; Davis v. Gray, 83 U. S. (16 Wall.) 203, 21 L. Ed. 447; United States v. Rickert, ,188 U. S. 432, 23 S. Ct. 478, 47 L. Ed. 532.