**STATE et al. v. REAGAN COUNTY PUR-
CHASING CO. et al.**

No. 4200.

Court of Civil Appeals of Texas. El Paso.
June 1, 1944.

Rehearing Denied July 13, 1944.

Tom Scurry, Brady Cole, and Baker, Botts, Andrews & Wharton, all of Houston, for Group No. 1 Oil Corporation and others.

D. A. Richardson, of Oklahoma City, Okl. (James J. Cosgrove, of Ponca City, Okl., and Richardson, Shartel, Cochran, Chilson & Pruet, of Oklahoma City, Okl., of counsel), for Reagan County Purchasing Co.

John C. Townes, E. E. Townes, R. E. Seagler, and R. F. Higgins, all of Houston, and Henry H. Brooks, A. J. Wirtz, and Powell, Wirtz, Rauhut & Gideon, all of Austin, for Humble Oil & Refining Co.

PRICE, Chief Justice.

The majority of the Court has come to the conclusion that there was error in the original disposition of this case, the error consisting in reversing and remanding the case for trial. It is therefore ordered that appellees' motion for rehearing be in all things granted, the original opinion be withdrawn, and the following substituted therefor:

This is an appeal from a judgment of the District Court of Travis County, Ninety-eighth Judicial District. This judgment denied the State all relief sought and all relief sought by the other parties by the way of cross-actions. The State instituted the action against Reagan County Purchasing Company, Inc., Humble Oil & Refining Company, Big Lake Oil Company, and Group No. 1 Oil Corporation.

Plaintiff will be herein designated as "The State," the respective defendants as "Reagan," "Humble," and the other two defendants collectively as "Producers."

The State sought to recover royalties for oil produced on University lands from wells on leases held by the Producers. The petition averred that the Producers had failed to pay the State its full one-eighth royalty, if Reagan had failed to pay the Producers the price provided for in purchasing contract existing between Producers and Reagan. Privity between the State and Reagan and Humble was alleged by virtue of a contract between Humble and Reagan for the purchase and sale of the oil sold by Producers to Reagan under a contract between them and by the effect and provisions of a judgment dated the 12th day of October, 1928 by the District Court of Travis County in a case wherein

Gerald C. Mann, Atty. Gen., Peter Maniscalco, Geo. W. Barcus, and Glenn R. Lewis, Asst. Attys. Gen., Robert E. Kepke, former Asst. Atty. Gen., of Tulsa, Okl., and Scott Gaines, of Austin, for appellant.

J. C. Adams, of Tulsa, Okl., William Pannill, of Ft. Worth, R. F. Burges and Burges, Burges, Scott, Rasberry & Hulse, all of El Paso, and Black, Graves & Stayton, of Austin, for Big Lake Oil Co.

the State was plaintiff and the defendants here were defendants.

Producers answered by general denial and a conditional cross-action against Reagan and Humble seeking, in the event that the State was entitled to recover additional royalty against them, to recover additional purchase money for the oil sold by them to Reagan under the contract between Producers and Reagan. The prayer of the Producers was that they recover the full value of the unpaid purchase price of the oil delivered under the contract to Reagan, in the event the State recovered against them. The effect and provisions of the judgment pled by the State were relied upon to create privity between the State on the one hand and the Producers, Reagan and Humble on the other.

Reagan replied by several dilatory pleas, general denial, plea of payment in accordance with the contract; an additional cross-action against Humble in the event the State or Producers recovered anything against it. This additional cross-action was based on the contract between Reagan and Humble and on the provisions of the judgment. Further, an additional cross-action was asserted against Producers.

Humble replied by dilatory pleas, general denial and cross-action against Reagan.

The foregoing is not an attempt to state fully even the substance of the pleadings. The transcript alone consists of over seven hundred and fifty single-spaced pages. It is thought that the statement made will be a sufficient basis for a discussion of the issues involved, rather meager though it be.

The rights asserted by all parties herein are contractual. The basis of such rights are evidenced by documents. These documents are as follows:

1. Various leases from the State to the Producers;

2. Contract between Producers and Reagan dated November 24, 1924;

3. Contract between Humble and Reagan dated December 15, 1924;

4. The judgment in Cause No. 42752, District Court of Travis County, entered October 12, 1928.

These leases were issued under the Act of 1917, Chapter 83, Vernon's Ann. Civ.St. art. 5338 et seq. The legal effect and obligations of leases of this character have many times been determined by the Supreme Court. By the lease the lessee is vested with full title to all of the oil underlying the land included in the lease. The one-eighth royalty provided for in favor of the State represents purchase money. Theisen v. Robison, 117 Tex. 489, 8 S.W.2d 646, 652. In that case it was said: "In Sawyer v. Robison, 114 Tex. 437, 268 S.W. 151, it was determined that —An oil lease under the 1917 act 'occupies exactly the same legal status as a grant from the state to land. It concedes to the lessee and his assigns all the right and title of the state to the estate dealt with, under the conditions stated therein, the same as a patent conveys the title of the state to land.' "

From the fact of the title of the oil in place, it follows that the lessee has the full legal title to the oil when captured or produced. "Full legal title" implies the right and power to sell and convey to others. Stephens County v. Mid-Kansas Oil & Gas Co., 113 Tex. 160, 254 S.W. 290, 292, 29 A.L.R. 566.

In short, the right of the State as to the oil when same was produced was not an undivided one-eighth interest therein. Her right was to be paid by the lessee monthly an amount equaling one-eighth of the full value of the oil produced by the lessee. This is the provision of the leases. Such provision is provided for and enjoined by the statute authorizing the lease. Acts 1917, Chapter 83, Vernon's Ann.Civ. St. art. 5338 et seq.

Prior to November 24, 1924, the Producers drilled a large number of oil wells on some of the leases in question here, securing large production. This contract was preceded by another contract in which the creation of Reagan was one of the provisions thereof. It is not thought necessary to state the terms of this preliminary contract. A large quantity of oil was sold thereunder on the same terms as provided for in the contract of November 24, 1924. It is not deemed necessary to further state the terms of the preliminary contract, a general statement thereof is made in the opinion of the Austin Court of Civil Appeals on the appeal from the order overruling Reagan's plea of privilege herein. Reagan County Purchasing Company et al. v. State, Tex.Civ.App., 65 S.W.2d 353.

The contract of November 24th between Producers and Reagan provided for the sale by Producers to Reagan of ten thousand barrels of oil per day between March 1st and December 1, 1925, and thereafter

up to twenty thousand barrels per day; further provided that all covenants should run with Producers' leasehold estates.

Much of the controversy here arises over the proper construction of the price clause of the purchasing contract. The provisions thereof are as follows: "The Purchasing Company agrees to pay and the Producers shall receive for the petroleum oil sold and delivered by the Producers to the Purchasing Company under this agreement the fair market price of such oil on the date same is delivered by the Producers into the pipe line and gathering system of the Purchasing Company. The fair market price of such oil on the date it is delivered shall be ascertained and determined as follows: The Purchasing Company shall, at the time of remitting payment for any such oil received by it, ascertain the average posted price in the Mid-Continent Field for oil of similar gravity on the date such oil was delivered to the Purchasing Company, by such of said general Purchasing Companies hereinafter named, not less than two in number, as shall on said respective delivery dates be purchasing oil of similar gravity in the Mid-Continent Field at their respective posted prices. The general Purchasing Companies whose posted price shall be taken and considered for the purpose of determining the aforesaid average posted price, shall be the Prairie Oil and Gas Company, The Texas Company, the Gulf Oil Corporation, the Humble Oil and Refining Company, and the Magnolia Petroleum Company. Any price posted by any subsidiary company and/or purchasing agency of any of the aforesaid companies shall be treated and considered as a posted price of the principal or parent company of any such subsidiary company or agency. The term 'Average Posted Price' as used in this agreement, shall be construed to mean the price or quotient obtained by dividing the sum of all the posted prices on any given date of all the aforesaid purchasing companies whose price or prices, under this agreement are authorized to be considered, by the number of said posted prices. At the time of remitting the purchase price of any such oil to the Producers, selling and delivering the same to the Purchasing Company, the Purchasing Company shall remit to such Producer a summary of the computations used and made by the Purchasing Company in ascertaining the average posted price as herein authorized. The average posted price, as herein provided, shall be taken and treated as the fair market price of oil of similar gravity in the Mid-Continent Field and shall be conclusive upon all parties to this agreement. The average posted price as computed by the Purchasing Company, shall be accepted as correct, unless notice of objection to the correctness thereof is given by any Producer complaining to the Purchasing Company within fifteen (15) days after receipt of such remittance."

The Mid-Continent Field referred to in the clause of the contract just quoted was defined by the contract. Generally speaking, as defined in the contract, it consisted of the States of Oklahoma, Kansas, and a large portion of the State of Texas. It has not been attempted to set out the entire substance of the contract in question, but it is thought enough thereof has been stated for discussion of the issues involved.

On December 15, 1924, Reagan entered into a contract with Humble for the sale and delivery of the oil it contemplated receiving under its contract with Producers. The price clause of the Reagan-Humble contract is as follows: "The price which the buyer agrees to pay and the seller shall receive for oil sold and delivered under the preceding articles hereof each day shall be that price which on the same day the seller is required to pay and the Producers are entitled to receive for oil of similar gravity sold and delivered on the same day by the Producers to the sellers under the purchasing contract determined as therein provided, plus twenty cents (20¢) per barrel."

It should be explained here that Reagan received the oil at its gathering lines and delivered it at a pipe line specified by Humble in the contract. This was the additional service performed by Reagan in connection with its delivery of the oil to Humble.

Under the contract of November 24, 1924, Producers delivered to Reagan millions of barrels of oil for which Reagan paid them millions of dollars. This same oil has been delivered by Reagan to Humble in pursuance of the contract of December 15, 1924, and Humble has paid Reagan millions of dollars therefor.

Under the contract between Reagan and Producers Reagan had the duty of computing the price due from it for oil delivered to it, and tendering to Producers such price in accordance with the contract; further,

the tender was to be accompanied by a summary of the method used in arriving at the amount due. Reagan, in tendering and making the numerous periodical settlements called for by the contract, has in every case accompanied the tender with an accurate summary as to how the amount tendered as a performance was computed. Reagan, from the first delivery of oil to it under the contract up to November, 1931, has made its tenders in accordance with its construction of the price clause of the contract. This construction has at all times been shown in the summaries accompanying the tenders. All payments that have been made have been made in accordance with Reagan's construction of the contract.

In applying the price clause of the purchasing contract, Reagan considered equal prices appearing in the postings of one of the companies whose posted prices were to be applied and were applied by the bulletin to different localities in the Mid-Continent Field as one price and counted same in arriving at the price only once. In short, Reagan applied a simple average.

Appellants contend that the purchasing clause provides for the weighted average. By this is meant that the quotient of all prices offered in the Mid-Continent Field by one of-the Purchasing Companies and applied by such company to particular localities, whether equal or unequal, should have been used in computing the average posted price.

The method used by Reagan in arriving at the relevant average posted price is substantially set forth in Paragraph 11 of the State's Fourth Amended Original Petition, filed on the — day of ———, 1939. Reagan does not deny this was substantially the method used, but justifies on the ground that it was the method provided for in the contract. Paragraph 11 also sets forth the method appellants contend should have been applied, which is the weighted average theory—all prices, equal or unequal, offered as to any field or locality in the Mid-Continent Field.

For something like a year and a half Reagan determined its liability on the basis of the simple average standard without protest on the part of the Producers. The Producers remitted one-eighth of the price paid by Reagan as fulfillment of their obligation to the State under the respective leases held by each.

As to oil not delivered under the contract, in settling with the State, the Producers used the same formula applied in the same way as for oil received by Reagan under the contract. At sometime during this period, on request of Producers, Reagan, with the assent of Humble, agreed to eliminate the posted prices of the Purchasing Companies as to the Thrall Field. As we understand it, this was rather an isolated field and the prevailing posted prices as to same were relatively uniformly low. After this agreement Reagan ceased to apply the posted prices for the Thrall Field, but continued the application of the standard as theretofore, with that exception.

The State, on September 21, 1926, filed suit No. 42572 in the District Court of Travis County against all the parties herein. Sought was the cancellation of the leases involved here; the cancellation of the contract of November 24, 1924 between Reagan and Producers, hereinbefore described; likewise the contract of December 15, 1924 between Reagan and Humble, hereinbefore described. For grounds of cancellation of the leases a want of conformity to law in obtaining same was averred. For the cancellation of the two State contracts, it was alleged that same were entered into for the purpose of defrauding the State out of its royalty due by virtue of the leases. There were alternative pleas as to any of the leases that might be held valid, that the lessees have failed and refused to pay the State one-eighth of the full value of the oil produced, and a recovery of the alleged deficit was sought, which deficit was alleged to amount to the sum of a million dollars.

The defendants joined issue on the State's petition. The Producers pled a conformity with the law in obtaining the leases and full payment of the royalty reserved in said leases; specially denied fraud as to the contract of November 24, 1924 and that of December 15, 1924; that the operation under those two contracts had resulted in benefit to the State. Reagan and Humble answered separately denying any fraud; further denied any contract liability to the State.

This action was determined on October 12, 1928 by a judgment. The judgment denied: (1) the cancellation of the contracts of November 24, 1924 and the resale contract of December 15, 1924, and

provided as to said contracts that same were, as adjudicated by the court, beneficial to the State; (2) adjudicated the leases valid; (3) it further provided that in addition to royalty payment required by statute and the leases, each Producer should pay monthly to the State a sum of money equal to one-sixteenth of Reagan's monthly net profits under the resale contract of December 15, 1924. To secure compliance of the Producers with this provision, it provided for the hypothecation by the Producers of forty-nine per cent of the capital stock of Reagan, same to be delivered to the Attorney General with power of sale in case of default. It might be added here that Producers owned forty-nine per cent of the capital stock of Reagan. There were to be yearly adjustments. These payments were allotted to the Available Fund of the University, and settlement was to be made from time to time with the Auditor of that Institution. (4) Reagan was required to furnish monthly to Producers a statement of its net profit on the Reagan-Humble contract; (5) that nothing in the judgment should be construed to add any obligation or burden on Reagan or Humble not already assumed by them under purchasing and resale contracts; (6) that nothing therein contained should affect the interpretation or construction of the leases involved; (7) that the State recover from each of the Producers the sum of $500,000 this, with the exception of $50,000 thereof, representing interest, was adjudged to the Permanent University fund; (8) that the State be denied all relief except as therein provided; (9) that the Producers' title to their leases be quieted; (10) (here we give a literal copy of Paragraph 8 of the judgment, as same was numbered in the judgment):

"8. It is found, adjudged and decreed by the Court that the Reagan County Purchasing Company, Inc., and the Humble Oil & Refining Company have paid the Big Lake Oil Company and Group No. 1 Oil Corporation in full for all oil purchased up to October 1, 1928, (excepting only the payments due from Reagan County Purchasing Company, Inc., to Big Lake Oil Company or to Group No. 1 Oil Corporation, for oil delivered by said producing companies during the month of September, 1928), and that Big Lake Oil Company and Group No. 1 Oil Corporation have paid the State in full for all royalty on account of such oil (excepting only the royalty payable upon account of production from said leases during the month of September, 1928); but this judgment is not to be taken as a construction of the purchasing contract of November 24, 1924, as applied to sales of oil under said contract, made prior to October 1, 1928, and the future construction of this contract shall remain open just as though this Decree had not been rendered, except that no questions may be raised as to payments or liability claimed for oil delivered prior to October 1, 1928. In the future if the Reagan County Purchasing Company, Inc., shall ascertain and pay the Big Lake Oil Company and/or Group No. 1 Oil Corporation a price for said oil which said Big Lake Oil Company and/or Group No. 1 Oil Corporation should deem insufficient under a proper construction of the price clause of the said contract, and a controversy should arise as to the proper construction thereof, then the State shall join the producing company or companies or intervene in such suit or suits as shall be necessary to construe the contract and recover the additional amount claimed, and shall be bound by any such final judgment which may be rendered by a Court of competent jurisdiction construing said contract and decreeing the correct amount due thereon."

On the quoted paragraph of the judgment taken in connection with the rest of the judgment, the State founded her case. If this judgment, considered as such, and wherein it evidenced the contract, has not the substantial effect asserted by the State, the State's case has failed. If the State's case failed, the action of the trial court in instructing a verdict was correct, and a correct judgment was entered on the verdict.

The Producers assert no right against any of the other defendants unless the State established a liability against them; Reagan asserts no right against Humble unless the Producers and the State recover against it; Humble asserts no right against Reagan or the Producers unless it be held liable to the State.

The State's theory, as reflected by her applicable pleadings and her points here, is that she is entitled to enforce, as to her royalty, the contract of November 24, 1924 between Reagan and Producers as against Producers, Reagan and Humble.

In order to sustain the State's theory, most certainly it must be established that some act in law occurring subsequent to the execution of the contracts has brought

this about. Neither Reagan nor Humble is a party to the leases. The leases measure the State's royalty as one-eighth of the value of the oil produced. The outstanding acts in law relied upon are the contract of November 24, 1924, the contract of December 15, 1924, and the judgment of October 12, 1928. In this case Reagan presented a plea of privilege to be sued in Tarrant County. This plea was overruled; Reagan appealed to the Austin Court of Civil Appeals. That Court affirmed the judgment of the trial court. Reagan County Purchasing Company et al. v. State, Tex.Civ.App., 65 S.W.2d 353.

In that case, before the trial court was not the question of what were the merits of the controversy, but the venue of the trial to determine the merits. The same question was before the Austin Court of Civil Appeals. Much that is said in the opinion in that case cannot successfully be challenged, but assent in all respects is not given to all that is said in the opinion. The different views held will appear from a comparison of that opinion with what is hereinafter said. The opinion disclaims an intention to pass upon the authority of the Attorney General to make the agreement or agreements evidenced by the judgment.

Restating the position of the State as to the judgment of October 12, 1928, by a paraphrase of what is said in her brief, it is, that said judgment was entered by agreement of all the parties at bar and approved in writing by all of these parties, and this served to integrate the leases and the purchasing contract and resale contract into a single general operating agreement and contract between all parties.

■ Our discussion shall proceed on the assumption that the judgment of October 12, 1928 was an agreed judgment; that as such in its purely decretal aspects it has the same force and effect as though rendered by the court after trial of the issues. By decretal, as here used, is meant the granting or denying of sought remedy. 26 Tex.Jur. p. 103, par. 401; Prince v. Frost-Johnson Lbr. Co., Tex.Civ.App., 250 S.W. 785, loc. cit. page 789, par. 8; Edwards v. Gifford, 137 Tex. 559, 155 S.W.2d 786.

■ This latter, even though it goes beyond the pleadings, with the proviso that the court had jurisdiction to enter the judgment with proper pleadings; further, in authorizing entry of an agreed judgment, the trial judge acts ministerially. His power depends on the agreement of the parties. Pope v. Powers, 132 Tex. 80, 120 S.W.2d 432; Wyss v. Bookman, Tex.Com. App., 235 S.W. 567.

■ In so far as the entry evidences agreements as to contractual obligations or provisions, same acquire neither validity nor sanctity from the fact that same are included in the entry of a judgment.

As illustrating what are considered as strictly decretal provisions of the judgment, we call attention to the following: (1) That as to the cancellation of the leases the State recover nothing; (2) that the title of Producers be quieted as to the leases; (3) that the State recover from each of the Producers the sum of $500,000; (4) that the contract between Producers and Reagan and the contract between Reagan and Humble be not cancelled; (5) that all relief sought by the State not granted by the judgment be denied.

The provision contained in paragraph No. 3, wherein it is provided that thereafter the Producers shall pay to the State a sum equal to one-eighth of the net profits realized by Reagan on the Reagan-Humble contract and the various related provisions thereof, evidence a strictly contractual provision.

By the alchemy of this judgment the State contends that she is entitled to measure her royalty, not by the standard prescribed by her leases, but by a standard prescribed by contract to which she was and is not a party; further, she is entitled to claim same against Humble and Reagan as well as the Producers, although neither Humble nor Reagan is a party to such leases. The judgment also purports to confer on the State the right from its date to collect from the Producers a sum equal to one-eighth of the profits made by Reagan on the resale contract of December 15, 1924. Under this purported right it appears that she has collected a sum in excess of over $500,000 from the Producers.

■ This judgment does not expressly impose any duty upon Humble, either when considered as such, or in its aspect as a contract. On Reagan it purports to impose a duty of reporting monthly to Producers as to profits made from the resale contract with Humble. Reagan assented to the provision that the State would join the Producers if they sued on the contract

of November 24, 1924. These matters are not either the awarding or the denial of present coercive relief. If binding and operative, they are such because the parties so agreed. The provision reciting that the contracts of November 24, 1924 and December 15, 1924 are beneficial to the State is not a judgment. At most, it is a recital of the ground upon which the Court denied the cancellation of those contracts. The judgment was the denial of the sought cancellation. This recital as a judgment was no more efficacious than if the court had assigned as a reason for denying the coercive and present consequential relief that such contracts in no way affected the legal rights of the State. Its effect as an agreement will be later discussed.

The judgment that the State was entitled to recover $500,000 against each of the Producers does not necessarily determine that the measure applied to determine the State's right was that provided for in the contract of November 24, 1924. There is some significance we think to be given in the construction of this judgment that the money recovery was against the Producers alone.

Giving the judgment the construction contended for by the State, the agreement was that thereafter the State's royalty was one-eighth of the amount to become due the Producers under the contract of November 24, 1924, plus a sum equaling one-eighth of the net profits realized by Reagan from the resale contract of December 15, 1924. This came about by a contract between the State, acting through the Attorney General, and the other parties acting through their attorneys of record.

■ The Attorney General is one of the Chief Magistrates of the State. Great powers have been conferred upon him by the Constitution and statutes of the State. His power, however, may be and has been limited by its source. His acts beyond the scope of his delegated power are not binding on the State.

Art. 4411, R.S.1925, provides: "No admission, agreement or waiver, made by the Attorney General, in any action or suit in which the State is a party, shall prejudice the rights of the State." This Article has been the law of Texas since 1846.

In State v. Harney, Tex.Civ.App., 164 S.W.2d 55, 56, writ refused, it is said: "As the powers and duties of the Attorney General are prescribed by the Constitution and Statutes, those powers must be limited to those so prescribed, and may not be enlarged by the courts." See also Scribner's Sons v. Marrs, 114 Tex. 11, 262 S.W. 722.

■ A determination of the terms upon which the public domain may be sold is not a function pertaining to the office of the Attorney General. This is especially true where, as here, by statute the manner of sale and the terms of sale have been fixed by the Legislature. Any attempted change in such terms would be a violation of the statute, and, if effective, a partial repeal thereof.

Suppose the trial court here had had occasion to submit to the jury the market value of the oil delivered by the Producers to Reagan from October 1, 1928 to November 30, 1931 (the suit period); further assume the jurors agreed to apply the standard prescribed by the contract of November 24, 1924, and that should be their answer, and in pursuance of such agreement a true calculation was made and the same was returned as their verdict in accordance with the agreement. These circumstances appearing on motion for new trial, there would have been but one result. Again, suppose that, in connection with the issue as to the market value of the oil, the court had instructed the jury in accordance with the formula laid down in Article 10 of the contract between Producers and Reagan. There can be no question but that the instruction would be erroneous.

Many of the factors prescribed in Article 10 of the contract might have evidentiary value in determining the market value of the oil in question at the relevant times. All the determining factors included in the determination of market value are not included in that contract.

■ From the issuance of these leases to the present, the fair market value of one-eighth of the oil produced determines the extent of the rights of the State in this respect. In this case the evidence fails to show what was the market value of the oil produced. The State has not sued to recover the market value of the oil produced, but the average posted price in the Mid-Continent Field as established by the posting of five specified companies. There has been paid a royalty of one-eighth of the average posted price correctly computed by Reagan in accordance with its construction of Clause 10 of the purchase contract. In addition thereto, the State has been

136

paid a sum exceeding $500,000 as royalty. The evidence fails to show whether such payments fell short of, equaled, or exceeded, one-eighth of the market value of the oil produced. In regard to the payment exacted from Producers by the judgment of one-eighth of the net profits of Reagan on the resale contract, we have said this is royalty—that is, part of the purchase money. This is thought to be correct under Section 11 of Article 7 of the Constitution, Vernon's Ann.St., despite the fact that these payments seem, by the judgment, to have been awarded to the Available Fund of the University.

 Our holding is that the action of the trial court under the pleadings and evidence was correct. It is not within our power to reverse a correct judgment to the end that another trial be had on different pleadings or evidence.

 The State's theory throughout was that the judgment sued upon was an agreed judgment. From this it is not to be taken that in every case where on the draft of the judgment for entry appears the signature of counsel indicating approval of the proposed form of evidencing the judgment pronounced, that such counsel agrees to the judgment. In most cases all the signature means is that the draft proposed truly evidences the judgment rendered by the court, and not that the judgment is agreed. According to the common and approved practice, the entering of his approval by an attorney on the draft of a judgment containing his exception thereto would not be considered a contradiction. While the judgment here under consideration does not purport in the body thereof to have been rendered by agreement, and no express stipulation appears in the record that the judgment be so entered, the fact that the approval of all the attorneys of record appears on the face of the judgment record and the signature of the trial judge appears subscribed thereto on the Minutes, in connection with other circumstances, warrants the holding, we think, the judgment was by agreement.

 Even though the holding that this was an agreed judgment is incorrect, it is thought the action of the trial court was correct. The State sued to enforce this judgment. The essence of a consequential judgment consists of the award or denial of sought remedy. It does not create substantive rights. This holds true, it is thought, as to even a purely declaratory judgment. Same is not creative. It does not create what it declares, but simply declares as to what existed before its rendition. If the judgment of October 12, 1928 was not an agreed judgment, any provisions purporting to change existing rights or to create new contractual rights are void.

This is the first point of error in the State's brief: "The error of the court in directing a verdict against the plaintiff and in not enforcing the judgment of October 12, 1928, which requires that the value of the State's royalty shall be determined by applying the price clause of the Purchasing Contract of November 24, 1924."

The second proposition thereunder is as follows: "The judgment of the court of October 12, 1928, in Cause No. 42,752, is not subject to the collateral attack sought to be made upon it by Humble and Reagan in this suit."

 If the judgment be an agreed judgment, and the agreements evidenced thereby are unenforcible on account of the lack of authority of the Attorney General to bind the State, it is immaterial whether the attack be direct or collateral. If not an agreed judgment, the contractual provisions thereof are void and subject to collateral attack. It is perhaps immaterial to determine whether the attack made be direct or collateral. Even though it may be immaterial to the disposition of this case, it is thought that the attack made by Humble and Reagan is direct. The action is to enforce the judgment. All the vital parties thereto are parties here. It is sought to use this judgment as a sword, not as a shield. Under these circumstances, it is thought Reagan and Humble would have a right to make a direct attack. Walker v. Chatterton, Tex.Com. App., 222 S.W. 1100.

 However, the matter is regarded as immaterial, and it is not held that the pleadings of Humble and Reagan were sufficient to constitute a direct attack. Further, the determination by interpretation of the scope and effect of a judgment is neither a direct nor a collateral attack thereon.

Here there is ground for the inference at least that the State received as much as she would have received had the controversy not been settled as it was. It may

be there has been received as royalty an amount equaling that provided in the leases. In any event, the contrary does not appear from the evidence. The provision of the lease according to the statute, is now and has always been the measure of the royalty.

It is, therefore, ordered that the prior opinion be withdrawn, the rehearing of appellees in all things granted, and there being no error in the judgment of the trial court, same is in all things affirmed.

SUTTON, Justice (dissenting).

The writer is unable to recede from the original and unanimous judgment and opinion of this Court, and, with slight additions thought necessary in view of the majority opinion, shall reproduce, in the main, what was originally said in disposing of the case.

As said in the majority opinion, much of the controversy centers around the construction of the price clause of the purchasing contract. In the writer's view, the construction of the price clause is the very heart of the case and without the price clause there would have been no lawsuit. Virtually all the argument was devoted to that issue and it was repeatedly asserted all other issues were secondary. Without a determination of that issue, the litigants will get little benefit in the long run from the enormous energies expended on this case.

So far as the main suit is concerned, there is little or no difference between the State and the Producers, and none between Reagan and Humble. The principal contention of the State and the Producers is the trial court erroneously construed the price clause of the purchasing contract and wrongfully applied the simple average formula thereunder in computing the price to be paid for oil delivered under the contract. The contentions of Reagan and Humble are the judgment should be affirmed because the State could not bring and maintain the suit because there is no privity between them and the State; because the simple average formula was correctly applied; if not properly applied, then the definition employed is ambiguous, and the Producers have agreed to such construction and are bound thereby; because the Producers accepted payments made on the basis of such construction without giving the proper notices of their objections as required by the contract.

I shall undertake to determine the first contention of Reagan and Humble, that the State could not bring and maintain the suit because of the lack of privity. Prior to October 12, 1928, the State, in Cause No. 42752, styled The State of Texas v. Reagan et al., sued to cancel out its leases with the Producers and the sale and resale contracts on allegations of fraud and other grounds, and in the alternative, if the leases and contracts be sustained, to collect additional royalties. All the parties here were parties to that suit. That case was compromised and an agreed judgment entered October 12, 1928, wherein all the contracts and leases were agreed and adjudged to be legal and valid contracts and contracts "beneficial to the State." In settlement of the alternative plea the State was paid one million dollars and declared to have a future one-eighth interest in the net profits of the Producers as additional royalties.

It is clear that on the date the agreed judgment was entered the parties were aware of an impending controversy over the construction of the price clause of the purchase contract and were agreed that any such controversy should be settled in one lawsuit. The State was the only party that could be brought into such a suit, except by legislative consent or the voluntary entry through its proper officer. The parties therefore undertook to obligate themselves, including the Attorney General for the State, that should a controversy arise "as to the proper construction thereof, then the State shall join the producing company or companies or intervene in such suit or suits as shall be necessary to construe the contract and recover the additional amount claimed, and shall be bound by any such final judgment which may be rendered by a court of competent jurisdiction construing said contract and decreeing the correct amount due thereon." I agree with the construction of the Austin Court of Civil Appeals in the plea of privilege case that the judgment contemplated, and the parties agreed, that a construction of the price clause should be binding alike on all parties at interest, and that any further controversy concerning the construction of the price clause of the contract should be determined in one suit between all contracting and judgment parties. The suit is brought, therefore, by virtue of the voluntary obligation and undertaking

of the parties and is maintainable on the same basis.

I come now to a construction of the price clause of the purchasing contract, copied in the majority opinion.

It is readily apparent from the provisions of the price clause the parties desired to arrive at the "fair market price of such oil on the date same is delivered." Probably the most accurate way of determining the fair market price,—certainly the average price, would be to ascertain the total amount paid in the Mid-Continent Field, as defined in the contract, on any given delivery date for oil of similar gravity and divide that amount by the number of barrels of oil purchased. But the parties adopted a different method approximating that price, the average posted price. As said by counsel, price bulletins which are the means of posting prices are public property and easily available to any interested in them. The amounts of oil purchased by parties and concerns are private matters and presented more laborious and difficult problems.

Reagan and Humble contend the formula used in determining the "average posted price," as defined in the price clause above and described as the simple average is the proper one. By simple average they mean, and is meant, a division of the sum of the unequal posted prices by the number of such unequal prices. To illustrate the simple average and the method or formula used by them, counsel for Humble, in the oral arguments, distributed a sheet which was substantially as follows:

Battlestein's displayed five suits, three at $29.75 and two at $50; Sakowitz four at $35 each; and Stein twelve at $16.50 each, four at $12.50 each and fifteen at $22.50 each, forty suits in all, totaling a value of $914.75.

The contention consistently made is the contract unambiguously means the simple average formula is the formula intended, and that in the illustration there were but six posted prices of suits, one for $29.75, one of $50, one of $35, one of $16.50, one of $12.50, and one of $22.50, making a total of "$166.00" divided by 6, resulting in the simple average of $27.66, which is claimed to be the one intended and the correct one. There were forty suits exhibited. If the ordinary individual, including grade arithmetic pupils, is asked what will forty suits cost of the average price of $27.66, he will answer readily $1106.40. If he is told forty suits were bought at the price listed above he will as readily answer the total cost to be $914.75 and the average price per suit to be $22.86, and can prove it. On the theory figures do not lie, he will undertake to demonstrate $27.66 is not the average price of the forty suits.

Simple average is a species of averages as is a marine average. It is likewise an artificial average as is an average weekly wage for the whole of a year fixed by a compensation statute which provides that if a workman works less than 50 weeks in a year his weekly average wage shall be determined by dividing the total amount received by the number of weeks he actually worked, which is not, of course, an average weekly wage for a year.

To the ordinary individual there is but one average, the arithmetical true average. True, because its exactness can be demonstrated by the most elementary and simplest application of the rules of multiplication and division. For example, in Wentworth's Arithmetic, page 57, is to be found Problem 35, a part of which is: "A dealer paid $2356 for 62 cows. How much a piece did he pay for the cows?" It is but another way of asking what is the average price or cost per cow. To put the simple problem another way: A dealer paid $2356 for 62 cows. He paid $45 for 20; $40 for 20; $30 for 10, and $29.67 for 12. What was the average cost or price per cow? The application of the simple average formula gives an average of $36.14 and not $38, or the true or exact average. This further illustrates the inaccuracy of the application of the simple average.

"Average" is variously defined by the dictionaries. As a transitive verb it is defined to be the mean between unequal numbers. Of course, that is the ordinary problem. As an adjective it is defined: "Referring to the calculated mean of several amounts, numbers, or quantities; as average price; the average product." As a noun: "The mean amount, number or quantity; the quotient of any sum divided by the number of its terms. Any general mean estimate or quantity." New Standard Dictionary. "To establish by dividing the aggregate of a series by the number of its units." The Short Oxford Dictionary of the English Language, 1933. Webster defines the word in many different relations, including the simple average, marine average, etc.

ent

The Supreme Court approved an opinion by the Commission wherein was considered school depository statutes and "average daily balances" which were defined thus: "The various balances for the different days in the period for which the interest is to be paid are the daily balances for the interest period. The sum of those daily balances divided by the number of days in the interest period is the average daily balance for the interest period." Jones v. Marrs, 114 Tex. 62, 263 S.W. 570, at page 574, top of second column. I think it must be assumed that for much of such a period the balances would not change in such an account from day to day. It is unnecessary to illustrate the result if only the unequal balances were totaled and divided by the number of them to obtain the average daily balance for the purpose of computing the interest. Here the Supreme Court applied the ABC rule of construction and gave the language its ordinary and commonly understood meaning, which must always be done, and is thought must be done in the instant case. Had the parties intended to apply a particular species of averages, such as the simple average, they would have and should have so specified.

Speaking of "average," the Supreme Court of Iowa said in Long v. Ottumwa Ry. & Light Co., 162 Iowa 11, 142 N.W. 1008, at page 1015, top of second column, "As ordinarily employed the word is not open to construction. It is the mean between two or more quantities or measures or numbers and is usually mathematically expressed by the quotient of the sum of the quantities, measures, or numbers which are being compared, divided by the number of items used in the comparison; as, for example, the average price of wheat in Chicago, New York, and Boston is found by adding the several prices and dividing the sum by the number of markets compared."

The Supreme Court of Utah (Talbot v. Anderson, 80 Utah 436, 15 P.2d 350, 351) had before it a provision of a real estate sales contract which contained this provision: "If water stock does not maintain an average water delivery of 1 acre foot of water per share per season for the period of contract the purchaser has the right to collect from seller the sum of $600 providing interest and crop payments have been kept up on place as afore agreed." The Court said: "The meaning conveyed by the word 'average,' as used in the contract, is the arithmetical mean, the result which is obtained by adding the water delivery of each of a number of years and dividing the sum thus obtained by the number of years so added. If the parties had intended that $600 should be paid to plaintiff in the event the water delivery in a given year was less than an acre foot per share, it would have been an easy matter to have so provided, and in such case there would have been no occasion to use the word 'average.' "

The preparation of this sales contract unquestionably involved much care and study. Great care must have been taken to avoid any mistake about what was meant by the term "average posted price" which is repeated ahead of the contract definition. To emphasize the meaning the posted prices to be employed in the process were described as "all the posted prices." The use of the description could hardly add anything to the generally and commonly understood meaning of "average posted prices." The ordinary individual would or could gather no other meaning or significance. It seems had the intention been to take into account only the unequal posted prices, the contract would have so provided, because it could have been so easily done; whereas the language employed was about as clear and concise as could have well been employed with the added emphasis. The language is so clear and understandable as to admit of no construction, and an apology is due for devoting so much space to a thing so apparent.

There is another reason, it is thought, why the simple average cannot be permitted to stand here: The Mid-Continent Field, as defined by the sales contract, embraced the states of Kansas, Oklahoma and Texas, excepting only the Gulf Cost area which lies south and east of a line approximately straight along the south line of Sabine County on the east and the north and west lines of Dimmit County on the west. The great oil fields of North Texas, Northeast and Northwest Texas, West and Southwest Texas and the East Texas oil fields were all within the Mid-Continent Field. In both oral and written arguments the facts were asserted to be, which is believed to be unchallenged and supported by the record, that the Panhandle Field, which embraces Hutchinson, Carson and Gray Counties, and produced only a small per cent of the oil produced in the Mid-Con-

tinent Field, exerted in excess of fifty per cent of the total influence or weight in determining the average posted price of the oil here involved by virtue of the application of the simple average as against the remainder of the Mid-Continent Field. The figures are: 1157 days are involved in the suit period. For 695 days the Panhandle prices exerted an influence of more than 60%; for 456 days more than 50%, and for only 6 days less than 50%. It ranged as high as 68% and 70%. This because the prices in those counties, usually listed as two separate prices—one for Gray and another for Hutchinson-Carson, but sometimes as three prices—were very substantially lower than the prices listed or posted in the remaining areas of the Mid-Continent Field. To illustrate, the Texas Company, November 4, 1931 for 40 gravity oil posted the following prices: North Texas, 85¢; North Central Texas, 85¢; Central Texas, 85¢; Gray, 73¢, and Carson-Hutchinson, 68¢. Under the simple average the 85¢ was used but once along with the 73¢ and 68¢ posted in the Panhandle. The result was to reduce the price of oil delivered under the contract. As we understand it, there is no contention but that the three prices of 85¢ each constitute three separate posted prices but account is taken of but one, because they are equal in value or amount. The record is plain, and it is well understood by those who have any familiarity with the practices and methods of oil purchasing companies, that under this and all price bulletins the company would accept only the oil produced in North Texas at the price of 85¢ posted in that purchase area and that North Central and Central Texas oils would not be accepted in North Texas, though the price posted is the same.

Mr. Roberts, Reagan's auditor-secretary and treasurer, who handled many of the computations and schedules submitted with remittances, recognized that two or more prices equal in amount were nevertheless two or more separate posted prices, according to his interpretations of the price bulletins. For the purpose of computing the average posted price in arriving at the price to be paid Producers for their oil under the simple average used he used the price but once. Again, Magnolia, in its price bulletin of June 19, 1931, posted prices as follows: "NORTH AND NORTH CENTRAL TEXAS 35¢ Including Burkburnett, Archer, Stephens, Henrietta, Elec-

tra, Comanche-Olden-EAST TEXAS 20¢–THRALL 25¢–CENTRAL TEXAS 34¢–Including * * * –PANHANDLE-GRAY COUNTY 30¢–PANHANDLE-CARSON AND HUTCHINSON COUNTIES TEXAS 26¢ * * *." In the computation NORTH TEXAS AND NORTH CENTRAL TEXAS, and CENTRAL TEXAS were considered as separate posted prices. But, Magnolia, July 22, 1931, by a bulletin increased the price in NORTH AND NORTH CENTRAL TEXAS to 40¢, and as well Oklahoma to 40¢ which had theretofore been 36¢. By a bulletin dated July 24, 1931, it increased its CENTRAL TEXAS price to 40¢. They were then no longer treated as separate posted prices but regarded as one with the practical result, applied the simple average, though the prices were increased, the price to the Producers, and consequently to the State, was lowered. We cannot understand that these prices when they became the same for these areas were any less separate posted prices than when they were unequal. As I understand it, the company would not accept oil from one area in another at the same price any more than it would when the prices differed in amount.

For the reasons indicated, the conclusion is inescapable the plain, unambiguous language of the contract requires that all posted prices, whether equal or unequal in amount, must be employed in ascertaining the average posted price.

It has been suggested there may be some difficulty in determining what are the posted prices. The record discloses those who have dealt with them have had no considerable difficulty in determining them from the price bulletin. As heretofore pointed out, oil purchasing companies set up for their purposes and convenience certain purchasing areas. The various companies do not set them up alike. Their respective price bulletins set them up in such a way as to make it easy enough to determine the several separate areas. To illustrate, representatives of the Gulf, Magnolia and Texas Companies were able readily to designate from the price bulletin the areas to which the prices were applicable whether equal or unequal in amount. Likewise, Mr. Irby and his assistants were able to do so with practical success. Errors may be found as must be expected when such a number of things and quantities are dealt with. But should there be difficulty encountered, the contract must,

nevertheless, be given effect, because difficult or even impossible performance will not relieve against performance. Kingsville Cotton Oil Co. v. Dallas Waste Mills, Tex.Civ.App., 210 S.W. 832; Masterson v. Amarillo Oil Co., Tex.Civ.App., 253 S.W. 908, writ refused; Levy Plumbing Co. v. Standard Sanitary Mfg. Co., Tex.Civ.App., 68 S.W.2d 273, writ refused; Embry v. Lewis, Tex.Civ.App., 19 S.W.2d 87, and Ellwood et al. v. Nutex Oil Co., Tex.Civ.App., 148 S.W.2d 862, writ refused.

From what has already been said it is clear the writer is not in accord with the proposition the price clause of the contract is ambiguous and the Producers are bound by a mutual construction thereof. As already said, the contract provision is plain, understandable and unambiguous. In such circumstances the interpretation of the parties becomes immaterial and inadmissible. Murphy v. Dilworth et al., 137 Tex. 32, 151 S.W.2d 1004 (Alexander, C.J.) and cases there cited; Williston on Contracts, Rev.Ed., 1936, Secs. 619 and 623 (1920 Ed., Sec. 623, Vol. 2, p. 1206), same Rev.Ed. Vol. III, pp. 1750–1752, and cases cited. It may be observed here that the record discloses that in the early life of the sales contract, as a practical proposition and so far as the results were concerned, it made no material difference which method was used.

There is more difficulty in reaching a satisfactory conclusion on the proposition the Producers accepted considerable payments without giving the notice of the objection to the correctness thereof as provided in the price clause of the contract, notwithstanding the rather satisfactory explanation made for such failure. It is evident, however, from the record and the persistent attitude of Reagan and Humble here that nothing short of a final decision of a court of last resort can or will convince them of any error in the matter of computations and the correctness and applicability of the simple average.

The judgment in cause No. 42752, supra, found, adjudged and decreed that the State and the Producers had been paid for all oil delivered prior to October 1, 1928, and continued: "but this judgment is not to be taken as a construction of the purchasing contract of November 24, 1924, as applied to sales of oil under said contract, made prior to October 1, 1928, and the future construction of this contract shall remain open just as though this decree had not been rendered, except that no question may be raised as to payments or liability claimed for oil delivered prior to October 1, 1928." Thus all claims for any sum or sums claimed to be due prior to October 1, 1928, were settled for all time. This was another benefit that accrued to Reagan and Humble by virtue of the judgment. This marked the beginning point for future claims for under payments. November 6, 1928, Big Lake wrote Reagan wherein it acknowledged receipt of the remittance covering the oil purchases between October 1 and 15, 1928, and advised Reagan therein that it has certain objections to the correctness of the average posted price as computed and would state them in the next few days. November 7, 1928, Big Lake wrote, supplementing the letter of the 6th, and said: "We object to your method of ascertaining the 'average posted price' of the oil purchased as not being in accord with the method prescribed in the contract." The letter continued to point out Reagan had taken the five postings of the five companies but once for the Mid-Continent Area and suggested that each filed should be treated as a place of posting; that the mere fact the prices posted at two or more places may be the same does not warrant the treatment of them as one posting, and suggested a joint auditing of the posted prices periodically and offered to co-operate in such respect. By adoption these protests were renewed regularly. December 31, 1928, the other Producer, Group No. 1, wrote a letter similar to that of Big Lake in so far as it pointed out the "average posted price" was not ascertained in accordance with the contract, and that the mere fact that prices posted at two or more different places are equal does not warrant the treatment of them as one posting. By adoption this protest was continued to July 26, 1929. To the letters written by the Producers Reagan replied (among other things): "We beg to advise that at no time have we failed to pay, nor are we failing to pay, the fair market price for oil purchased under the contract of November 24, 1924." In one of the replies the date was given as "12/4/24." Reagan and Humble have consistently contended and insisted they have properly computed the price and have paid the fair market price for the oil delivered.

The notices are regarded as sufficient under the contract to advise Reagan the Producers were not satisfied with the method used by it in arriving at the aver-

age posted price and that it was not taking into account for the purpose of the computations all the posted prices as provided in the contract. In other words, the letters of objection raised specifically the issue raised in this lawsuit with respect to the failure to use all the posted prices. In such circumstances it was unnecessary for the Producers to bring their protests down to date, but were relieved from such necessity by the persistent and insistent adherence of Reagan to the simple average under the applicable rule of law that a useless and unnecessary thing will not be required. Notice under any circumstances where provided for is intended to serve some useful purpose; it contemplates an amicable settlement and avoidance of unnecessary controversy and litigation. The principle has been adhered to and followed in the following cases cited in the Producers' brief: Sun Mutual Ins. Co. v. Mattingly et al., 77 Tex. 162, 13 S.W. 1016; Niagara Ins. Co. v. Lee et al., 73 Tex. 641, 11 S.W. 1024; Illinois Bankers' Life Ass'n v. Floyd, Tex.Com.App., 222 S.W. 967; Fidelity Phœnix Fire Ins. Co. v. Oldsmobile Sales Co., Tex.Civ.App., 261 S.W. 492; Knickerbocker Life Ins. Co. v. Pendleton et al., 112 U.S. 696, 5 S.Ct. 314, 28 L.Ed. 866; Louisville & N. R. Co. v. Shepherd, 7 Ala.App. 496, 61 So. 14; Scott County Milling Co. v. St. Louis, I. M. & S. R. Co., 127 Mo.App. 80, 104 S.W. 924; Washington Horse Exchange v. Louisville & N. R. Co., 171 N.C. 65, 87 S.E. 941; Henderson Tire & Rubber Co. v. P. K. Wilson & Sons, 235 N.Y. 489, 139 N.E. 583.

Certainly the course of this litigation demonstrates the futility of continuing the notices provided for and the conduct and course pursued by Reagan sufficient to excuse the discontinuance and render useless and unnecessary the giving thereof.

On the original consideration of this case it was observed that much had been said and written about the measure of the State's royalty and the invalidity of the judgment in Cause No. 42752, if it undertook to make the price clause the measure of the State's royalty. This was primarily by Reagan. It was likewise there observed that such argument was considered by the way, because the amount of royalty to be paid by the Producers to the State was of no legitimate concern of Reagan and Humble. It was then considered of no real importance but now the case is determined on that alone. Of course Reagan

and Humble are only concerned with the total amount they must pay under the contracts and have no concern with the division to be made between the Producers and the State of that sum, or any other sum. There is no controversy in this lawsuit between the State and the Producers about the manner of computing the royalty and never has been. The State has never claimed more than one-eighth of the initial sale price. The Producers concede if more is due under a proper construction of the price clause they owe one-eighth of it to the State, and the State on the other hand is not claiming more if the full amount has been paid under a proper construction.

The Producers and the State have treated one-eighth of the initial sale price —the contract price—as the proper measure of that royalty. It is a matter of common knowledge it is so treated throughout the State. As pointed out the leases embodied substantially the provisions of the law. It is thought perfectly clear the Act as well as the parties contemplated such to be the measure of the royalty. The reports made by the Producers under the terms of the law and leases with the remittances which required a sworn statement of the amount produced and "the market price of the output," of pipe line and tank receipts, etc., were made on that basis. This is, of course, on the rightful assumption the best price obtainable on the market will be had for the oil. Under such a royalty provision the royalty could not well be less than one-eighth of the amount received for the oil on the initial sale, whether equal to or greater than the market value. Any other rule would lead to interminable confusion and controversy. It is not conceivable the Producers could be heard to say (and they do not) they have made a favorable contract and are receiving more than the market value for the oil and insist the State accept less than one-eighth of that price. They could as well say it was through their efforts a market was created by them when they induced the purchase contract which resulted in the supply of transportation facilities, etc., and thereby enhanced the price obtainable for this oil and the State is not entitled to participate on the basis of a market that is of their making. No lessee under such a contract may ever say the value of the oil is less than what he gets for it at the first sale and delivery and

none have ever said so far as this writer is able to ascertain, and the attorneys make the same confession.

It is not thought it is a mere coincidence that the price fixed for the oil in the price clause is identical with the measure fixed for the State's royalty in the leases. This is recognized by the majority wherein it is said: "From the issuance of these leases to the present, the fair market value of one-eighth of the oil produced determines the extent of the rights of the State in this respect." It was certainly known by the Producers, and doubtless known by all parties concerned, on what basis the State was paid and upon what basis the payments must be continued. It then became necessary that the contract price be one such as would support the State's royalty, hence the fixing of the same value. The sales contract merely set up a practical, workable method for determining "the fair market price" rather than leave it open so controversy might arise on each delivery. This sales contract created the market for this oil and the only market price. It created a monopoly on that market. Moreover, it was the first purpose of all the contracts culminating in the final sales contract to create a market where there had been none, and without which there would still be none. This whole record makes such perfectly clear. In the initial contract, the Maryland contract, and in the sales contract that superseded it, it is recited the Producers were then producing approximately 5000 barrels daily and that they desire to further develop their fields "but are unable to do so because the Producers now have at or near said leasehold estates no sufficient market upon which to market and sell the petroleum oil which is now being produced by them, or that may hereafter be produced by them from their said leasehold estates." It is further recited the field is some 200 miles "from any oil trunk pipe line available for the transportation of the oil produced to a market" and the rail transportation is inadequate for economical transportation of such oil "to market, and the Producers have no market for but a small part of said oil and it is impractical for them to build storage tanks and store the oil being produced, * * * and it is necessary that the producers, in order that they may properly develop and operate their said leasehold estates, obtain a dependable market for all or a large part of the oil produced by them from their leasehold estates."

It seems clear enough the officers of the State charged with the duty of collecting the State's royalty under the statute have correctly discerned the true intent of the Legislature, and wherein the Act, Vernon's Ann.Civ.St. art. 5350, provides the sworn reports of the lessees accompany remittances shall show "the market price of the output" contemplated the price for which the oil was sold f.o.b. transportation facilities and not some price they might conceive to be the market price. It couldn't mean any market value and anywhere on top of the ground, because the oil might under many circumstances, as was the case when the purchase contracts were made, be worth more underground. It is thought also the Legislature knew the oil produced from the State's lands must from necessity be marketed as the oil is from any other owner's land and it was merely undertaking to provide for a royalty equal to the royalty received by other landowners. The only difference between a commercial lease and the State lease is in the former there is severed and sold the 7/8 of the oil and royalty paid by delivering f.o.b. the other eighth to transportation facilities, whereas, the State lease severs and sells it all and the royalty is paid on the basis of the value of the eighth, which could not well be anything more or less than what the eighth would bring if sold.

It is the thought of this writer if all this oil were run away and the market wholly destroyed for a time the Producers and the State, the only parties to the leases, would be forced to a consideration of the very elements the price clause resorts to to determine the market value, and under the necessities of the circumstances and the opening up of the broad field of inquiry the writer thinks it may not be necessary to concede the price clause might not be available as evidence.

The market and "the fair market price" created by the purchase contract were not for the exclusive benefit of the Producers, but for the mutual benefit of both the Producers and the State. The price thus created can be nothing more nor less than the market price, because there is no other price, and it comports with the market price of like oil. In all the dealings between the parties it has been so treated. If the parties who are bound only with respect to the royalty so regard it and act thereon and make no issue of it, then a stranger to the royalty and the contract which provides for its payment certainly

ought not to be permitted to make an issue of it and defeat a right flowing from the Producers to the State. Reagan and Humble are as much strangers to the leases and the royalty as are the ultimate consumers of the oil who likewise have the cost of it passed on to them.

After all, the State's allegations are it "is entitled to receive as royalty 1/8th of the value of all oil covered by above referred to contract (the purchase contract), such value to be ascertained and determined according to the terms and provisions of said contract as hereinbefore set out." This is in universal accord with the operations and practices of the parties to the leases. The Producers do not contest the right of the State to recover one-eighth of the contract price and the price rightfully received under the sales contract. The fact the State may not have shown itself entitled to recover against Reagan and Humble will not defeat its right to recover against the Producers, nor the right of the Producers to recover against Reagan and Reagan against Humble on the cross-actions.

The history of these leases, the production and sale of the oil produced is not without interest, and somewhat curious interest. As understood, the controversy— one end of it at least—in Cause No. 42752 was not that the State had received less than one-eighth of the value of the oil, but less than one-eighth of what it had been sold for at the real and genuine initial sale. The State was not satisfied the sale made to Reagan and the price paid by it to the Producers was rightfully the initial sale and the fair market price, because the sale was made to Reagan in which the Producers had acquired and owned for a nominal consideration 49% of its capital stock, but the sale to Humble represented the market value. On that basis the settlement was made and the agreed judgment entered. Under the settlement terms the University of Texas received one million dollars in settlement of the accrued claims and has and will receive one-eighth of the net proceeds from the resale to Humble. It can hardly be said these sums represent benevolences.

It follows, therefore, that in the humble opinion of the writer the case should not be lost in a smoke-screen thrown up by one having no connection with nor responsibility for the manner of ascertaining the amount of royalties due and the payment thereof, and that the case should be reversed; the amount if any due under an application made of the price clause formula in accordance with the views herein expressed determined and judgment rendered in favor of the State against the Producers, and based upon the same construction and application of the price clause and formula judgment rendered on the cross-actions respectively of the Producers and Reagan, and recovery denied Reagan and Humble on their cross-actions.

### On Motions for Rehearing.

PRICE, Chief Justice.

After careful consideration of the various motions for rehearing filed herein by appellants, the majority of the Court adhere to the views expressed in the last opinion on rehearing. The motions are overruled.

In the conditional motion of the Reagan County Purchasing Company there is a request that the opinion be modified or supplemented as follows: "By adding thereto a statement or holding to the effect that the judgment of the trial court, insofar as it denies this appellee relief upon its cross petition against Humble Oil & Refining Company, Big Lake Oil Company and Group No. 1 Oil Corporation, is affirmed only because of the affirmance by this Court of the trial court's judgment in favor of this appellee against the State of Texas and the Producers."

The request is granted and the opinion is so modified or supplemented.

This statement is further added, that the basis of the denial of any of the cross-relief sought by any of the parties defendant between themselves, was that such relief was sought only on the ultimate condition that a liability was established by the State against the lessees, that is, the Producers.