STATE of Texas, et al., Appellants,

v.

Gil HOLLINGSWORTH, et al., Appellees.

No. 3–89–066–CV.

Court of Appeals of Texas, Austin.

Dec. 6, 1989.

Rehearing Denied Feb. 28, 1990.

---

Jim Mattox, Atty. Gen., Jose Manuel Rangel, Asst. Atty. Gen., Austin, for appellants.

Broadus A. Spivey, Paul E. Knisely, Spivey, Grigg, Kelly & Knisely, Austin, for appellees.

Before POWERS, CARROLL and ABOUSSIE, JJ.

POWERS, Justice.

Gil Hollingsworth and Bryce E. Evans appeal from a trial-court judgment cancelling certain claims to real property recorded by them with the county clerks of various Texas counties, the judgment having been rendered in a suit to quiet title brought by several State authorities.[1] We will affirm the judgment.

## THE CONTROVERSY

The controversy requires that we determine the proper construction and scope of Subchapter G of the Texas Natural Resources Code. Tex.Nat.Res.Code Ann. §§ 52.221–52.252 (1978). The Sixty–Eighth Legislature, repealed the subchapter, effective February 1, 1983, 1983 Tex.Gen.Laws, ch. 1, at 1, but the controversy arose from events immediately before that date.

Subchapter G, administered by the Commission of the General Land Office, pertained generally to the issuance of permits to prospect for oil and gas on certain real property in the public domain. One such permit gave the holder an exclusive right to prospect for State-owned oil and gas on "surveyed lands," and to obtain a lease for the development of such minerals if he found production in paying quantities.

Section 52.222 of Subchapter G authorized persons to select surveyed lands upon which they wished to prospect for oil and gas, and to file with the county clerk of the county in which a tract was located a written application for a permit, designating the tract sufficiently to identify it. The county clerk was directed to "file and record" the application on payment of a $1.00 fee; and within 30 days thereafter, the application was required to be filed in the General Land Office.[2]

Section 52.225(a) directed the Commissioner to file the application on receipt of (1) a $1.00 filing fee, (2) an affidavit indicating the applicant's interest in any other lease, patent, or permit issued under Chapter 52 of the Natural Resources Code, and (3) a sum of money calculated on the basis of 10 cents per acre for each acre included in the application. Section 52.225(b) provided as follows:

> If examination of the application and field notes are found to be correct and the area for which application is made is covered by the provisions of this subchapter, the *commissioner shall issue* to the applicant or his assignee a permit conferring on him an exclusive right to prospect for and develop oil and gas within the designated area for a period of not more than two years.

(Emphasis added). Section 52.226 required an annual payment of 10 cents per acre, in addition, until oil in paying quantities was obtained and the payment of royalty commenced. (*See* § 52.229). The mention of a royalty referred to the fact that § 52.231 gave the permit holder the right to a lease if he found and produced oil or gas in paying quantities, the lease to run for the period of such production. After the first year from the effective date of any lease,

---

1. The appellees are Garry Mauro, Commissioner of the General Land Office, the State of Texas, the School Land Board, the Board for Lease of University Lands, and the Board for Lease of the Department of Corrections.

2. Section 52.224 of Subchapter G provided a similar procedure in the case of unsurveyed lands, the applicant being required to file his original application with the county surveyor, from whom he received field notes of the tract indicated in his application. The papers were required then to be filed with the General Land Office, evidently by the surveyor. We shall discuss only § 52.222, which governed surveyed lands, but our reasoning and holdings apply equally to § 52.224.

§ 52.236 provided for the payment of two dollars per acre and a royalty of one-eighth on the value of the gross production of oil, and in the case of a gas well a royalty of one-tenth on the value of the meter output of all gas disposed of off the premises. The sums received by the Commissioner from such payments were directed by § 52.241 to the permanent funds of the public schools and asylums, or to the available fund or permanent fund of The University of Texas.

Subchapter G originated in a statute enacted in 1913. 1913 Tex.Gen.Laws, ch. 173, at 409. A 1917 enactment, in substantially the same form, was compiled as article 5338 of the 1925 Revised Civil Statutes. 1917 Tex.Gen.Laws, ch. 83, at 158.[3]

3. The mineral-permit procedure of Subchapter G originated in a 1913 enactment of the Legislature. Section 1 of the act included within its terms "[a]ll public school, University, asylum and the other public lands, fresh water lakes, islands, bays, marshes, reefs, and salt water lakes...." Persons wishing to prospect on "any of the surveyed lands" were required to file with the county clerk an application designating the land he wished to prospect, and another application in the General Land Office within 30 days of his filing with the county clerk. Persons wishing to prospect on any of the specified submerged lands, or any "unsurveyed public land," were required to file a written application with the county surveyor, who was obliged to survey the tract and furnish the applicant the field notes and the original application. The papers were required then to be filed in the General Land Office. On payment of the required sums and the satisfaction of other conditions imposed in the Act, the Commissioner was required to issue a permit. 1913 Tex.Gen.Laws, ch. 173, at 409.

In 1917, the foregoing statute was amended. Section 1 of the Act substituted 39 named substances in lieu of the general term "minerals" used in the 1913 enactment. The provisions relative to obtaining a permit to prospect for petroleum and natural gas remained basically the same, and new procedures were supplied for obtaining permits to prospect for "coal and lignite" and "other minerals." The public lands within the Act remained the same. 1917 Tex. Gen.Laws, ch. 83, at 158. The provisions relating to all minerals *except* oil, natural gas, coal, and lignite were later amended in 1919. 1919 Tex.Gen.Laws, ch. 79, at 241 (2d C.S., 36th Leg.). We need not refer to those amending provisions.

As a result of the foregoing enactments, the 1925 compilation of statutes provided in part as follows:

Art. 5338. Permit.—Subject to the terms hereof, permits for the development of oil and gas may be issued to any person, firm or corporation upon the following lands: All surveyed public school, University, asylum land and other public lands, fresh water lakes, river beds and channels, belonging to the State and all of said lands, except public school and asylum lands sold or disposed of by the State or by its authority with a reservation of minerals or mineral rights therein, and lands purchased with a relinquishment of the minerals therein. [Acts 1917, p. 158; Acts 2d C.S.1919, p. 241.]

Art. 5339. Application for surveyed lands.—One desiring to obtain the right to prospect for and develop oil and natural gas that may be in any surveyed area included herein shall file with the county clerk a written application designating it sufficiently to identify it. .... [Acts 1917, p. 158.]

Art. 5340. Unsurveyed lands: application.—One desiring to obtain the right to prospect for and develop oil and natural gas in any unsurveyed areas named in this law shall file with the county surveyor a written application.... [Id.]

Art. 5341. Issuance of permit.—When the Commissioner receives an application that was filed with the county clerk or with the surveyor and the field notes and plat, ... [and related papers], he shall file the same, and if upon examination the application and field notes are found correct and the area applied for is within the provisions of this law, the Commissioner shall issue to the applicant or his assignee a permit conferring upon him an exclusive right to prospect for and develop petroleum and natural gas within the designated area for a term not to exceed two years. [Id.]

The 1925 compilation also included the terms of 1925 Tex.Gen.Laws, ch. 71, at 225, pertaining to university lands. The enactment, compiled as art. 5343, provided as follows:

Art. 5343. University permits.—The provisions of subdivision 3 of this Chapter [asylum and school lands that had been sold], so far as they relate to a combination of permits and extension of time for beginning development and time for development thereunder, shall apply to permits upon University land.

The compilation here includes the note: "[f]ollowing is additional legislation. Acts 1925, Chapter 71, p. 225." Article 5343 then continued:

Section 1. That all university land now unsold and all of said land that has heretofore been sold with reservation of the minerals therein and that which may hereafter be sold with reservation of the minerals therein, whether known or unknown, shall be included in this Act and leases thereon conferring upon persons, firms and corporations the right to develop the oil and natural gas that may be in said land shall be subject to sale by the Commissioner of the General Land Office

Before the repeal of Subchapter G, Hollingsworth and Evans undertook to obtain prospecting permits from the Commissioner, as authorized by the Subchapter. They filed and recorded with the county clerks of various counties applications covering approximately 95,500 acres of land, embracing 70,000 acres dedicated to the Permanent University Fund, 15,800 dedicated to the Permanent School Fund, and 9,700 acres belonging to the Texas Department of Corrections. When they attempted to file their application with the Commissioner, he returned them on the ground that Subchapter G was "invalid."

Thereafter the Commissioner and other affected public bodies sued Hollingsworth and Evans in district court. They prayed for judgment cancelling the applications, recorded in the counties where the lands in question were situated, "and removing the cloud on [the State's] title" which resulted from "the filing of such applications." Alternatively, they prayed for a declaratory judgment as follows: (1) Subchapter G did not apply to the lands in question; or (2) Subchapter G was "without force and effect"; or (3) Subchapter G did not apply to the lands in question until other public authorities had made the lands available for leasing under Subchapter G; or (4) the Commissioner was not obliged to consider the applications "for any purpose" after the repeal of Subchapter G.

Hollingsworth and Evans counterclaimed for judgment compelling issuance of the permits on the grounds that they were entitled to them as a matter of law or that the Commissioner was estopped to refuse their issuance.

On undisputed and stipulated facts, and following a bench trial, the court below rendered judgment cancelling the recorded applications in the various counties, "as a cloud on the title" of the State, based on determinations that the applications were "null and void" and "of no force and effect." The judgment recites that all relief not granted "is expressly denied."

Hollingsworth and Evans appeal on six points of error: (1) the trial court lacked subject-matter jurisdiction in the absence of a final decision by the Commissioner, from which a suit for judicial review might be filed by a "person aggrieved" as contemplated in the Administrative Procedure and Texas Register Act, Tex.Rev.Civ.Stat. Ann. art. 6252–13a, § 19(a) (Supp.1989); (2) the trial court erred in exercising jurisdiction because essential issues were committed to the primary jurisdiction of the Commissioner, to be decided in a contested case under art. 6252–13a, §§ 13–20; (3) the Commissioner's action in denying Hollingsworth and Evans a contested-case proceeding deprived them of due process of law, and the trial court erred as a matter of law in failing to hold as much; (4) the trial court erred in holding the applications invalid because Subchapter G was a valid statute applicable to the lands in question, and Hollingsworth and Evans had complied with its terms under the evidence adduced; (5) the trial court erred in holding the applications null and void, respecting the lands

---

*in accordance with the provisions of this Act* and under such rules and regulations as may be adopted by said commissioner as may be necessary to the proper execution of its purposes; *provided, oil and gas permits and leases outstanding, shall not be affected by this Act except as provided in Section 14 hereof.*
(Emphasis added). Succeeding provisions tracked the 1925 enactment by providing for a sale price of ten cents per acre for the first year, twenty-five cents per acre for the second year, and fifty cents per acre for each year thereafter until production in paying quantities is secured, not to exceed five years, coupled with a royalty of one-eighth of the oil produced and saved and one-eighth of the natural gas produced and sold off the lease, "and in addition thereto such sum of [*sic*] any, that one may pay therefor as pro-

vided herein." Section 4 provided for the safekeeping applications to purchase and attendant bids; and "[w]hen an application shall have been filed and considered and the land found subject to lease, the lease shall be issued for a term not to exceed five years to the applicant *that pays the most,* in any sum, for the area in addition to the ten cents per acre and the stipulated royalty." (Emphasis added). All bids were rejected in the case of tie bids for the same property. We discuss in the text the effect of this 1925 amendment. Competitive bidding remained the basis for awarding leases on university lands until the present time, as indicated in the text.
The provisions of the 1925 compilation were carried forward to those of 1936 and 1948, thence into the National Resources Code.

of the Department of Corrections, because Subchapter G was a valid statute that encompassed those lands; and (6) the trial court erred in failing to hold the Commissioner estopped from refusing to issue the permits on a claim that Subchapter G was "invalid."

## DISCUSSION AND HOLDINGS

The validity of each of the six points of error brought by Hollingsworth and Evans, and the soundness of their argument thereunder, depends ultimately upon a single issue: Did Subchapter G, before its repeal, apply· to the lands in question, it being undisputed that 70,000 acres and 15,800 acres were dedicated to the university and public school funds, respectively, and that 9,700 acres belonged to the Department of Corrections? We conclude from our own study of the matter that the lands in question did not come within the scope of Subchapter G and its provisions for obtaining an exclusive right to prospect for oil and gas, followed by a lease subject to the specified royalties in the event oil or gas was found and produced in paying quantities.

By its terms, Subchapter G did not exclude any lands dedicated to the university and public school funds, or any belonging to the Department of Corrections. Indeed, § 52.241 implied that university and public school lands would be included within the scope of the subchapter. We believe, however, that such lands were not included within the scope of Subchapter G when the present controversy arose. We think, in fact, there can be no doubt about the matter because legislative enactments after 1913 (the date of the first enactment of provisions that formed the basic framework of Subchapter G) evidence an unmistakable purpose to establish a different scheme for developing the oil and gas under such lands, administered in whole or in part by public authorities other than the Commissioner. These subsequent enactments are now found in Tex.Educ.Code Ann. §§ 66.61–66.82 (1972 & Supp.1989) (university lands), Tex.Nat.Res.Code Ann. §§ 32.001–32.157 (1978 & Supp.1989) (public school lands), and Tex.Nat.Res.Code

Ann. §§ 34.001–34.066 (1978 & Supp.1979) (lands belonging to the Department of Corrections). These statutes became effective before the present controversy arose, and establish a system whereby public bodies other than the Commissioner are empowered to select the lands to be leased and to choose the timing for development of the oil and gas, as opposed to such matters being determined by private persons under Subchapter G. *See generally* Whitworth, *Leasing and Operating State–Owned Lands for Oil and Gas Development*, 16 Tex.Tech.L.Rev. 673, 677–679, 684–685, 685 (1985).

The system allows more favorable terms for the State, in the matter of royalties and other sums, than did Subchapter G before its repeal. The post–1913 legislation was enacted with the explicit purpose of taking university and public school lands out of the statutory provisions that became codified as Subchapter G, based on legislative determinations that these statutory provisions had worked to the serious disadvantage of the State. In the case of lands belonging to the Department of Corrections, it appears that the Legislature never intended them to come within the terms of the statutes later codified as Subchapter G; in any case, however, they were explicitly removed therefrom by an enactment which became effective well before the present controversy.

The permit system of Subchapter G is absolutely inconsistent with the competitive-bid system established in the subsequent legislation mentioned above. After university lands, public school lands, and lands belonging to the Department of Corrections were explicitly made the subject of competitive bidding, no later enactment ever placed such lands back within the scope of the statutes that became Subchapter G.

For all the foregoing reasons, we conclude the Commissioner lacked the power and authority to issue the permits for which Hollingsworth and Evans applied.

We should, of course, refer briefly to the legislative enactments upon which our con-

clusions are based. Each was enacted well after 1913 when the statutory provisions codified as Subchapter G were first enacted, and well after 1917 when they were altered to the form in which they existed in Subchapter G, but before the events in controversy here.

## University Lands

In 1925, the Legislature enacted a statute authorizing the Commissioner to solicit and accept competitive bids on university lands, the winner being entitled to drill for oil and gas and to obtain an "absolute lease" on production of oil or gas in paying quantities. The sums paid the State under such statute were directed to the Permanent University Fund. The statute extended for a period of five years "[a]ll oil and gas *permits*" theretofore "issued upon lands included" within the terms of the statute. (Emphasis added). 1925 Tex.Gen. Laws, ch. 71, § 14, at 229.[4] The 1925 enactment impliedly repealed the 1917 enactment in its application to university lands. *Id.* at 225–229; *see Theisen v. Robison,* 117 Tex. 489, 8 S.W.2d 646 (1928).

In 1929, the Legislature repealed the 1925 statute, and withdrew entirely, from lease or sale, "all oil and gas in University lands until such time as the Legislature may enact laws deemed adequate for the protection of University fund[s] ..." 1929 Tex.Gen.Laws, ch. 2, at 6. The Commissioner was expressly directed not to consider applications filed for the purchase or lease of such oil and gas, and to return all applications together with all remittances submitted to him. *Id.*

Soon afterwards, the same Legislature enacted a statute creating the Board for Lease of University Lands, and assigned it certain duties. Among these were the duty to place on the market whole surveys, or divisions of surveys, selected by the Board from "University lands," for the purpose of soliciting bids for the purchase of oil and gas, the successful bidder being entitled to a lease on the terms set out in the statute. The bids were required to specify a delay rental, a royalty, and any other sums the

bidder wished to offer. Minimums were provided in the statute for delay rentals (10 cents per acre) and royalty (one-eighth for oil and gas), the Board being empowered to set higher minimums. Payment of funds under the leases was directed to the Permanent University Fund (the royalties) and the Available University Fund (delay rentals and all other sums apart from royalties). The enactment covered all unsold university lands and all minerals reserved under university lands that had been sold. 1929 Tex.Gen.Laws, ch. 282, at 616–21. The Legislature enacted the statute to be effective immediately, reciting as follows in § 19:

> Since there is no law authorizing the sale of oil and gas leases on University lands this fact creates an emergency....

*Id.* at 621. The declaration that "no law authoriz[ed] the sale of oil and gas leases on University lands" refers, of course, to that Legislature's previous withdrawal, from all lease or sale, "all oil and gas in university lands ... until such time as the Legislature may enact laws deemed adequate for the protection of University funds...." The 1929 enactment is now codified, in substance, as Tex.Educ.Code Ann. §§ 66.61–66.82 (1972 & Supp.1989).

We conclude that the Legislature in 1925 removed from the scope of the 1917 enactment (which became Subchapter G) the oil and gas under university lands. So much is implied in the provision for a competitive-bid system in the 1925 enactment, and its express provision for extending, for five years, the oil and gas *permits* previously issued on university lands. In any event, the matter was placed beyond doubt by the 1929 enactment which explicitly withdrew from sale or lease "all oil and gas in University lands," until the effective date of the 1929 statute which created the Board of Lease of University Lands with a duty to administer a competitive-bid system. The emergency clause in that enactment made it clear that the Legislature understood that such lands were *not* included within the terms of any other existing statute,

**4.** *See* fn. 3

such as the 1917 enactment that had, by that time, been compiled as Tex.Rev.Civ. Stat.Ann. art. 5338 (1925) (and later codified as Subchapter G of the Natural Resources Code).

### Public School Lands

In 1931, the Legislature enacted a statute to regulate the sale and lease of lands set apart for the benefit of the public free school fund. 1931 Tex.Gen.Laws, ch. 271, §§ 8–11, at 454–55. Sections 8 through 11 pertained to the leasing of such lands for the production of oil and gas. They established a competitive-bid system administered by the Commissioner and set minimum prices per acre (one dollar) and royalty (one-eighth), the proceeds being directed to the available and permanent school funds. Section 13 of the Act provided: "Articles 5323, *5338*, and 5374, Revised Civil Statutes, 1925, and all other laws or parts of laws in conflict herewith are hereby repealed." (Emphasis added). Article 5338 of the 1925 Revised Civil Statutes was, of course, the 1917 enactment which authorized prospecting permits on surveyed lands. We need not digress on the effect of this apparently unqualified repeal of the provisions which became Subchapter G, for it was followed in 1939 by another statute as discussed below. It is sufficient for present purposes that the Legislature in 1931 obviously did not intend public school lands to be included within the fixed-price and fixed-royalty system eventually codified as Subchapter G.

In 1939, the Legislature withdrew from sale or lease all public free school lands "authorized by any law of this State to be sold or leased" until the expiration of 90 days from the date of the Legislature's adjournment. The withdrawal did not apply, however, "to applications to purchase or lease filed with the Commissioner ... prior to the effective date of [the] Act or to applications" then involved in litigation. In addition, the enactment suspended all laws and parts of laws, in conflict with the enactment, for the same period of 90 days after adjournment. In an emergency clause, the Legislature declared "that existing laws do not provide adequate protection

for the Permanent School Fund in the selling and leasing of lands set apart" for the fund. 1939 Tex.Gen.Laws, ch. 1, §§ 1–4, at 463–64. The same Legislature subsequently enacted legislation establishing the School Land Board and directing it to administer a different system in order to supply adequate protection for the fund. It became effective 90 days after adjournment. The Board was given power to lease surveyed and unsurveyed lands set apart for the permanent free school fund, based on a competitive-bid system, the Board being authorized to fix the dates for the sale and lease of surveyed lands and the prices for which surveyed and unsurveyed lands would be leased. The Board was given authority to reject any and all bids. 1939 Tex.Gen.Laws, ch. 3, §§ 2–8, at 473–78. These provisions became Tex.Rev.Civ.Stat. Ann. art. 5421c (1962) before their present codification as Tex.Nat.Res.Code Ann. §§ 32.001–32.157 (1978 & Supp.1989).

Nothing we have found indicates that the Legislature ever intended, in any subsequent enactment, to place public free school lands once again within the provisions now found in Subchapter G. We therefore conclude that the Subchapter does not apply to such lands.

### Lands of the Department of Corrections

In 1930, the Legislature enacted a statute providing for the leasing of lands owned and held by the State as "prison lands." The enactment created the Board for Lease of Texas Prison Lands (now the Board for Lease of the Department of Corrections), and established a competitive bidding procedure administered by the Board with respect to the making of oil and gas leases on such lands. The statute specified the royalties and other sums payable in connection with such leases. The emergency clause declared the Legislature's view that there existed "no law authorizing the sale of oil and gas leases on Prison lands...." 1930 Tex.Gen.Laws, ch. 13, at 16 (4th C.S., 41st Leg.). The enactment now exists as Tex.Nat.Res.Code Ann. §§ 34.001–34.066 (1978 & Supp.1979). We

conclude, therefore, that the Legislature intended that the leases of such lands for oil and gas development be governed by the new statute and not the existing statutes which eventually became Subchapter G.

In summary, the lands in question might fall within Subchapter G owing to the all-encompassing scope of the terms "surveyed lands" and "unsurveyed lands" to which the Subchapter literally applies. It is equally plain, however, that the lands fall explicitly within the statutory provisions for competitive bids administered by the other public bodies mentioned above. The deciding issue is where the Legislature intended to place the lands. We think every applicable rule of statutory interpretation and construction points unequivocally to an intention to place the lands under Tex.Educ.Code Ann. §§ 66.61–66.82 (1972 & Supp.1989) (university lands), Tex.Nat. Res.Code Ann. §§ 32.001–32.157 (1978 & Supp.1989) (public school lands), and Tex. Nat.Res.Code Ann. §§ 34.001–34.066 (1978 & Supp.1989) (lands belonging to the Department of Corrections) in lieu of Subchapter G. It is sufficient to mention only that the more specific statutes are a better guide to Legislative intention than the general provisions of Subchapter G. *Sam Bassett Lumber Co. v. City of Houston,* 145 Tex. 492, 198 S.W.2d 879, 881 (1947); Code Construction Act, Tex.Gov't.Code Ann. § 311.026 (1988); *see also Allen v. Mauro,* 733 S.W.2d 228 (Tex.App.1986, writ ref. n.r.e.). We hold, therefore, that the Commissioner had no authority to issue the permits under Subchapter G.

Hollingsworth and Evans attack the trial court's jurisdiction to award the judgment rendered solely on the theory that the Commissioner had the authority that they claim he had. On the same theory, they claim estoppel, a denial of due process, and a legal right to the permits in question. We overrule their points of error and affirm the trial-court judgment.